DAVID T. PROSSER, J.
¶ 1. This is a review of a published decision of the court of appeals[1] reversing a grant of summary judgment by the Washington County Circuit Court[2] to West Bend Mutual Insurance Company (West Bend)[3] against one of its insureds.
¶ 2. The insured, Michael Gundrum (Gundrum), hosted an underage drinking party. One of Gundrum's many guests, Matthew Cecil (Cecil), assaulted and seriously injured another guest. Gundrum knew that Cecil had a tendency to become belligerent when he was intoxicated but he permitted Cecil to drink anyway. The victim, Marshall Schinner (Schinner), ultimately sued Gundrum and West Bend to secure damages for Schinner's injuries.
¶ 3. West Bend disputed coverage. The insurer argued that it had no duty to defend and indemnify Gundrum because his actions as a party host were intentional; thus, there was no "accident" and no "oc *534 currence" under the Gundrum family's homeowner's insurance policy. West Bend also contended that even if there were an occurrence under the policy, there was no coverage because of an exclusion in the policy for bodily injury arising out of a non-insured location. The party had been held at a shed at Gundrum Trucking, a family-owned business that was not an insured location under the homeowner's policy.
¶ 4. The circuit court granted summary judgment to West Bend because it determined that there is no accident when someone intentionally procures alcohol for an underage drinking party, and even if Gundrum',s actions were an accident, the victim suffered bodily injury at an uninsured location.
¶ 5. The court of appeals reversed on both issues. The court of appeals concluded that there was an occurrence because Schinner's assault was an accident when viewed from the standpoint of either the injured person (Schinner) or the insured (Gundrum). The court of appeals also concluded that the non-insured location exclusion did not apply because Schinner's injury did not arise from some "condition" of that premises.
¶ 6. The primary question before us is whether Schinner's injury resulted from an occurrence as defined by the West Bend homeowner's insurance policy, thus triggering coverage for Gundrum. If the answer is yes, we are required to determine whether that coverage was excluded because the injury "arose out of' an uninsured location that was not "used in connection with" an insured premises under the homeowner's policy.
¶ 7. After carefully considering the facts in the record, the allegations in Schinner's complaint, the pertinent language in the homeowner's insurance policy, and our previous interpretations of "occurrence" in insurance policies, we reverse the court of appeals and reach the following conclusions.
*535 ¶ 8. First, Gundrum's actions in setting up an isolated shed for a drinking party, procuring alcohol and expecting others to bring alcohol, inviting many underage guests to the party, and encouraging the underage guests to drink — especially an underage guest known to become belligerent when intoxicated — were intentional actions that violated the law. Gundrum's many intentional wrongful acts were a substantial factor in causing Schinner's bodily injury. Viewed from the standpoint of a reasonable insured, Gundrum's intentional actions created a direct risk of harm resulting in bodily injury, notwithstanding his lack of intent that a specific injury occur. Thus, Schinner's bodily injury was not caused by an "occurrence" within the meaning of the policy, and West Bend is not obligated to provide insurance coverage for Gundrum.
¶ 9. Second, even assuming there was an occurrence under the West Bend homeowner's policy, coverage is excluded because the injury arose out of the use of an isolated shed for an underage drinking party on uninsured premises. The fact that the Gundrums kept some personal property insured under the policy at the shed did not make the shed a premises used in connection with the insured's residence, as those terms are defined in the policy. Thus, the business shed was not an insured location triggering coverage under the homeowner's policy.
I. FACTUAL BACKGROUND
¶ 10. The facts of this case are derived from Schinner's Second Amended Complaint against Gun-drum and West Bend, witness statements, police reports, Gundrum's deposition, and the West Bend insurance policies of record.
*536 ¶ 11. In December 2008 Gundrum, then 21, resided with his parents, Scott and Teri Gundrum, at their residence on State Highway 144, near Slinger, Wisconsin. The Gundrums had purchased a Home and Highway[4] policy (homeowner's policy or the policy) from West Bend covering their residential premises. The homeowner's policy contained personal liability coverage for persons insured under the policy, including Gundrum.
¶ 12. The personal liability coverage applied to an "occurrence":
A. Coverage E - Personal Liability
If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:
1. Pay up to our limit of liability for the damages for which an "insured" is legally liable... .
2. Provide a defense at our expense by counsel of our choice....
¶ 13. The homeowner's policy defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."
¶ 14. The policy contained an exclusion for bodily injury or property damage liability arising out of a premises that is not an "insured location."[5]
¶ 15. The homeowner's policy also defined an insured location in part as, "[t]he residence premises," the *537 "part of other premises, other structures and grounds used by you as a residence," and any premises used by the insured "in connection with" the premises described above.
¶ 16. West Bend had also issued a commercial general liability (CGL) policy to Howard, Jan, Scott, and Guy Gundrum, doing business as HJSG Enterprises, located on Arthur Road near Slinger. The facilities at this address were commonly referred to as Gundrum Trucking,[6] where the events in question took place. Because of its liquor exclusion clause, HJSG's CGL policy is not at issue in this case.
¶ 17. On December 14, 2008, Gundrum hosted a party in a shed at Gundrum Trucking. The party lasted into the early morning hours of December 15. It was not the first party hosted by Gundrum at the shed. *538 Gundrum testified in a deposition that there was at least one prior party, but other witnesses recalled multiple prior parties.[7]
¶ 18. As with previous parties, Gundrum texted friends about the party and expected his friends to text or tell others, ensuring a well-attended party. Gundrum later estimated that more than 40 partygoers came to the shed on the night of December 14. He also estimated that 40 to 50 percent of the people were under the age of 21.
¶ 19. The site of the party was a pole barn approximately 40-by-60 feet in size. It had no windows. This shed was used by the trucking company, but it also stored some personal property belonging to Gundrum's extended family. The property included boats, a camper, and two snowmobile trailers. Gundrum's immediate family stored snowmobiles in the shed. These snowmobiles were insured under the Gundrums' homeowner's policy. Gundrum referred to the shed as the "toy shed" because of "all the junk that's piled in there."
¶ 20. A portion of the shed was set up for parties. It was furnished with couches, chairs, a table, a Ping-Pong table, a CD player, and a refrigerator. The law enforcement personnel who responded to Schinner's injury described the atmosphere in the shed as consistent with an "underage alcohol party."
¶ 21. Alcohol was prevalent at the party, despite the fact that up to half of the guests were underage. Some guests brought their own alcohol; underage guests expected to obtain alcohol from people who were of legal drinking age. Gundrum purchased two cases of Busch Light beer for a friend and himself. He kept the *539 beer in the refrigerator but admitted that it was available for people who did not bring their own alcohol to the party. Law enforcement officers reported a "large amount of alcoholic beverages" in the shed, and Gun-drum was aware that guests were becoming intoxicated from the alcohol at the party. In fact, Gundrum himself stopped drinking when he realized that so many guests showed up and became intoxicated. He claimed that he wanted to monitor the situation. Nevertheless, alcohol consumption at the party continued. One of the party games, "beer pong," utilized the Ping-Pong table in the shed and encouraged more alcohol consumption.[8]
¶ 22. Cecil was one of the intoxicated underage guests who participated in beer pong during the party. He was known by Gundrum and others to become belligerent when intoxicated. Gundrum testified that he knew from previous occasions that Cecil would become confrontational, had a history of picking on weaker kids, and used inflammatory language when intoxicated.
¶ 23. Eventually, an intoxicated Cecil started to make fun of Schinner at the party.[9] At least twice *540 Schinner asked Gundrum to intervene. But Gundrum's lone entreaty to Cecil to cease his abusive behavior was only temporarily successful. Cecil returned to making fun of Schinner.
¶ 24. At approximately 2:30 a.m., Schinner and some of his friends left the shed and got into a car to leave the party. Cecil also left the shed to taunt Schinner. When Schinner got out of the car, Cecil punched him twice in the face and then kicked him in the head after Schinner had fallen to the ground. Schinner was seriously injured in the assault.
¶ 25. About a half hour later, Washington County Sheriff deputies and medical personnel were dispatched to Gundrum Trucking in response to an anonymous phone call about a physical altercation and an injured male. Deputies had trouble locating Schinner because other guests had carried him inside the shed, which had no windows "to peer into," and no one in the shed would answer the door. Eventually, law enforcement and medical personnel gained entry and treated Schinner for his injuries.[10] The sheriffs report noted that once *541 law enforcement gained access to the shed, party guests scattered and hid on top of and behind a motorhome parked in the shed.
II. PROCEDURAL HISTORY
¶ 26. Schinner sued Gundrum and his insurer, West Bend, for his injuries. The Second Amended Complaint alleged, in part:
6. Defendant Gundrum knew and expected, based on a similar party held there months earlier, that individuals he invited would invite other youths, who in turn would invite others.
7. Defendant Gundrum knew and expected that a substantial number of individuals, 40%-50% of those in attendance, would be under the legal drinking age. The underage attendees at the party also knew that alcoholic beverages would be available for their consumption.
12. Defendant Michael Gundrum realized that the number of attendees, their age, and their intoxication level could lead to fights or arguments, and undertook the responsibility to monitor and supervise the party.
¶ 27. Schinner's first claim in the Second Amended Complaint alleged a statutory violation in serving alcohol to minors. It stated in part:
21. On December 14th and 15th, 2008, Gundrum "procured" alcohol beverages for Cecil as that term is used in Chapter 125 of the Wisconsin Statutes or sold, *542 dispensed!],] or gave away alcohol beverages to Cecil a[s] those terms are used in Chapter 125 of the Wisconsin Statutes.[11]
22. Further, on December 14th and 15th, 2008, Gundrum committed affirmative acts which encouraged, advised and assisted Cecil in his consumption of alcohol.
23. On December 14, 2008, Gundrum knew that Cecil had not attained the legal drinking age.
24. On December 14th and 15th, 2008, the consumption of beer by Cecil was a substantial factor in causing injury to plaintiff Marshall Schinner.
¶ 28. Schinner's second claim in the Second Amended Complaint alleged a breach of duty as a party host that ultimately led to Schinner's injuries.
¶ 29. West Bend moved the circuit court for "separate trials on the issues of insurance coverage and liability and a stay of proceedings on liability pending resolution of insurance coverage issues."[12] After conducting discovery, West Bend moved for summary judgment.
¶ 30. The circuit court granted West Bend's motion, concluding that there was no occurrence because "[tjhere is no allegation of any accidental conduct. . . . [A]ny acts on the part of. . . Gundrum were intentional, namely his providing of alcoholic beverages to under-aged persons." In addition, the circuit court ruled that *543 the location exclusion in the homeowner's policy was applicable "because the injury did not occur at an insured location."
¶ 31. The court of appeals reversed. Schinner v. Gundrum, 2012 WI App 31, 340 Wis. 2d 195, 811 N.W.2d 431. The court of appeals focused upon the assault on Schinner rather than on Gundrum's actions in determining whether there was an occurrence. Id., ¶ 10. Furthermore, the court of appeals focused upon whether the assault was an accident from the standpoint of the injured party — Schinner—although the court said it would have determined that there was an occurrence even if the assault were viewed from the standpoint of Gundrum, the insured. Id., ¶¶ 10, 15.
¶ 32. The court of appeals cited three decisions by this court to support its analysis that, "for purposes of determining whether an assault is an 'accident' or 'accidental' under an insurance policy, the assault and resulting injuries must be viewed from the standpoint of the person injured." Id., ¶ 11 (citing Tomlin v. State Farm Mut. Auto. Liab. Ins. Co., 95 Wis. 2d 215, 219, 222, 290 N.W.2d 285 (1980); Fox Wis. Corp. v. Century Indem. Co., 219 Wis. 549, 551, 263 N.W 567 (1935); Button v. Am. Mut. Accident Ass'n, 92 Wis. 83, 85, 65 N.W 861 (1896)). The court concluded that the assault was an accident from Schinner's standpoint and that this triggered coverage for Gundrum under the homeowner's policy. Id., ¶ 15. The court acknowledged that its conclusion appeared to conflict with Estate of Sustache v. American Family Mutual Insurance Co., 2008 WI 87, 311 Wis. 2d 548, 751 N.W.2d 845, which viewed the question of whether an assault was an accident from the standpoint of the insured, but the court stated that "the outcome of the analysis is the same when viewed from either vantage point." Schinner, 340 Wis. 2d 195, ¶ 16.
*544 ¶ 33. The court of appeals also concluded that the exclusion for non-insured locations in the homeowner's policy did not apply. Citing Newhouse v. Laidig, Inc., 145 Wis. 2d 236, 426 N.W.2d 88 (Ct. App. 1988), the court of appeals determined that Schinner's injury did not " 'aris[e] out of the shed under the terms of the policy because, while [the shed] was the undisputed physical situs of injury, no particular condition of the premises correlates to the basis of liability for the injury." Id., ¶ 28 (emphasis added).
¶ 34. West Bend petitioned this court for review, which we granted on June 13, 2012.
III. STANDARD OF REVIEW
¶ 35. The interpretation of an insurance contract is a question of law which this court reviews de novo. Everson v. Lorenz, 2005 WI 51, ¶ 10, 280 Wis. 2d 1, 695 N.W.2d 298.
¶ 36. "We review a grant of summary judgment de novo, relying on the same methodology as the circuit court." Estate of Sustache, 311 Wis. 2d 548, ¶ 17 (citing Doyle v. Engelke, 219 Wis. 2d 277, 283, 580 N.W.2d 245 (1998)). Summary judgment is proper where the record demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Wis. Stat. § 802.08(2) (2009-10); Estate of Sustache, 311 Wis. 2d 548, ¶ 17.
IV DISCUSSION
¶ 37. When determining whether an insurance policy provides coverage, a court first looks to the initial grant of coverage. Estate of Sustache, 311 Wis. 2d 548, *545 ¶ 22; Wadzinski v. Auto-Owners Ins. Co., 2012 WI 75, ¶ 14, 342 Wis. 2d 311, 818 N.W.2d 819. Normally, if the court determines that the policy was not intended to cover the asserted claims, it is not necessary to examine the policy's exclusions. Estate of Sustache, 311 Wis. 2d 548, ¶ 22. "If the court determines that the initial grant of coverage does cover the type of claim presented, the second step requires the court to examine the policy's exclusions to determine whether coverage has been withdrawn by an exclusion." Wadzinski, 342 Wis. 2d 311, ¶ 14 (citing Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 2004 WI 2, ¶ 24, 268 Wis. 2d 16, 673 N.W.2d 65). "[I]f coverage for the claim has been withdrawn by an exclusion, the court examines any exceptions to that exclusion that might reinstate coverage for the claim." Id.
¶ 38. We interpret an insurance contract as it would be understood by a reasonable person in the position of the insured. Am. Girl, 268 Wis. 2d 16, ¶ 23. In interpreting insurance policy language, we seek to "give effect to the intent of the contracting parties." Id. (citing Wis. Label Corp. v. Northbrook Prop. & Cas. Ins. Co., 2000 WI 26, ¶ 23, 233 Wis. 2d 314, 607 N.W.2d 276).
A. Was There an "Occurrence"?
¶ 39. The Gundrums' homeowner's policy states:
A. Coverage E - Personal Liability
If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:
1. Pay up to our limit of liability for the damage to which an "insured" is legally liable....
*546 2. Provide a defense at our expense by counsel of our choice ....
(Emphasis added.) As noted previously, the homeowner’s policy defines an occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions . . .." (Emphasis added.) The homeowner's policy does not define the term "accident."
¶ 40. Our first task in this analysis is to determine from whose standpoint an alleged accident should be viewed: the injured party or the insured? We then must determine whether the facts alleged in the Second Amended Complaint constitute an occurrence or accident covered under the policy.
1. From Whose Standpoint Should an Accident be Viewed?
¶ 41. Liability insurance policies, like the homeowner's policy in this case, typically contain a provision in which the insurer agrees to indemnify the insured against liability resulting from claims for bodily injury or property damage caused by an occurrence or accident. However, insurance treatises indicate that the definition of "occurrence" in standard liability policies has changed over time.
¶ 42. Before 1966 standard insurance liability policies did not contain an occurrence requirement. Instead, policies "required proof that the bodily injury or property damage was the result of an 'accident' which was interpreted to mean a sudden, identifiable event." 3 Martha A. Kersey, New Appleman on Insurance Law Library Edition § 18.02[6][a] (Jeffrey E. Thomas & Francis J. Mootz, III, eds., 2012). Standard liability policies were changed in 1966 to include the word *547 "occurrence," which was defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Id.
¶ 43. In 1986 the definition was changed again, this time removing the phrase "not expected or intended from the standpoint of the insured" and moving that phrase to the intentional acts exclusion in the liability policy. See id.
¶ 44. Assaults, given their intentional nature, would seem never to constitute an occurrence under a general liability policy. However, "courts have taken or adopted two divergent positions as to from whose perspective the assault is to be viewed in determining whether it constitutes an 'accident'." Annotation, Liability Insurance: Assault as an "Accident," or Injuries Therefrom as "Accidentally" Sustained, Within Coverage Clause, 72 A.L.R. 3d 1090, 1095 (1976); see also 9 Steven Plitt, Daniel Maldonado & Joshua D. Rogers, Couch on Insurance § 127:21 (3d ed. 2008). Some courts have held that this determination should be made from the standpoint of the injured party, while other courts have held that the determination must be made from the standpoint of the assailant who is often — but not always — the insured.
¶ 45. Schinner urges us to decide the question of whether an "accident" took place from the standpoint of the injured party. At oral argument, counsel for Schinner asserted that if the language "expected or intended from the standpoint of the insured" is not present in the definition of occurrence, then, as a default rule, the occurrence must be viewed from the standpoint of the injured party. Schinner and the court of appeals both *548 look to Button, Fox, and Tomlin as Wisconsin precedent on point. We examine each case in turn.
¶ 46. In Button, the insured plaintiff was injured by the "intentional discharge of a firearm" directed at him by an unknown person. Button, 92 Wis. at 84. The policy at issue, an accident policy, insured the plaintiff against "death or injuries through 'external, violent, and accidental means,'" but contained an exclusion for, among other things, intentional injuries. Id. at 84-85. The Button court concluded that "an injury intentionally inflicted on the insured person by another is an 'accidental injury,' when such injury is unintentional on the part of the insured." Id. at 85 (citation omitted). It is important to reiterate that, in Button, the injured party was also the insured party. Id. at 84-85.
¶ 47. In Fox, an insurer refused to indemnify an insured theater when one of the theater's employees assaulted a patron and the patron sued the theater for damages. Fox, 219 Wis. at 550 (summary of the case). Citing Button, the Fox court held that "[w]hether or not an injury is accidental under the terms used in the policy here involved is to be determined from the standpoint of the person injured." Id. at 551. Thus, Fox's holding misconstrued Button by substituting the term "injured" for "insured." While the Button plaintiff was both the injured and insured, Fox's holding focused exclusively on the injured party's perspective.[13]
*549 ¶ 48. Finally, in Tomlin this court concluded that injuries sustained by a state patrol officer who was stabbed by an insured motorist during a traffic stop were "caused by accident," within the meaning of the insured assailant's automobile liability policy. Tomlin, 95 Wis. 2d at 222. The Tomlin court stated:
In determining whether an injury is "caused by accident" or "accidentally sustained" within the coverage afforded by a liability insurance policy, the courts have been primarily concerned with the question of whether the occurrence is to be viewed from the standpoint of the injured person or the insured. The majority of courts, including this court, when considering the question, have held or recognized that the determination of whether injuries resulting from an assault were caused by "accident" or "accidentally sustained" must be made from the standpoint of the injured party, rather than from that of the person committing the assault.
Id. at 219 (citing Annotation, Liability Insurance: Assault as an "Accident," or Injuries Therefrom as "Accidentally" Sustained, Within Coverage Clause 72 A.L.R.3d 1090 (1976); 12 George J. Couch, Ronald A. Anderson, & Mark S. Rhodes, Couch on Insurance § 45:38, at 133-34 (2d ed. 1959)) (emphasis added).
¶ 49. On the surface, Tomlin stands for the proposition that an accident should be viewed from the standpoint of the injured party, not the insured. But there is a factual caveat. In Tomlin, the injured officer was stabbed by a minor. The officer sued the minor and the minor's parents. Under Wisconsin law, Wis. Stat. § 343.15(2) (1977-78), "Any . . . wilful misconduct of a person under the age of 18 years when operating a *550 motor vehicle upon the highways is imputed to the parents .... The parents . . . [are] jointly and severally liable with such operator for any damages caused by such. . . wilful misconduct." See also Wis. Stat. § 895.035 (1977-78). Consequently, the court may have perceived the parents as being in the same position as the theater in Fox.
¶ 50. While the decisions in Button and Fox make good sense, the rule stated in Tomlin comes out of an extraordinary situation and is distinguishable on that basis.
¶ 51. Analyzing an accident from the standpoint of the injured party goes against recent insurance decisions in Wisconsin, which considered whether the insured acted with lack of intent in a particular incident. See, e.g., Estate of Sustache, 311 Wis. 2d 548, ¶ 52; Am. Girl, 268 Wis. 2d 16, ¶¶ 37-49; Smith v. Katz, 226 Wis. 2d 798, 819-21, 595 N.W.2d 345 (1999); Bruner v. Heritage Cos., 225 Wis. 2d 728, 737-38, 593 N.W.2d 814 (Ct. App. 1999); Kalchthaler v. Keller Constr. Co., 224 Wis. 2d 387, 397, 591 N.W.2d 169 (Ct. App. 1999); cf. 43 Am. Jur. 2d Insurance § 674 (2003) ("The determination of whether an injury resulted from an accident within an occurrence clause of a liability policy is made from the standpoint of the insured."). This approach is consistent with the idea that a court should interpret an insurance policy from the standpoint of a reasonable person in the position of the insured. Wadzinski, 342 Wis. 2d 311, ¶ 11. Moreover, when interpreting an insurance contract a court should give effect to the intentions of the parties, Folkman v. Quamme, 2003 WI 116, ¶ 12, 264 Wis. 2d 617, 665 N.W.2d 857, not the intent of a third party.
¶ 52. Therefore, we hold that when an insured is seeking coverage, the determination of whether an *551 injury is accidental under a liability insurance policy should be viewed from the standpoint of the insured.
2. Determining Whether an Accident Took Place
¶ 53. Numerous courts and commentators, both inside and outside of Wisconsin, have attempted to define and interpret the term "accident" when determining whether insurance coverage applies. Compare 9 Steven Plitt, Daniel Maldonado, & Joshua D. Rogers, Couch on Insurance § 126:26 ("an accident is a distinctive event that is unforeseen and unintended") with 1 Arnold P Anderson, Wisconsin Insurance Law § 5.18, at 26 (6th ed. 2012) ("The difficulty comes in determining . . . what triggers the coverage.").
¶ 54. This court has interpreted the term "accident" in an insurance policy in previous decisions, and we look to our earlier decisions for guidance.
¶ 55. In Doyle we reviewed an employer's alleged negligent supervision of its employees. Doyle, 219 Wis. 2d at 281. The court was called upon to interpret the term "event" in a CGL policy, which defined "event" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Id. at 289.
¶ 56. Because the word "accident" was undefined in the CGL policy, the Doyle court looked to dictionary definitions and found that "accident" was commonly defined as " '[a]n unexpected, undesirable event' or 'an unforeseen incident' which is characterized by a 'lack of intention.'" Id. (quoting The American Heritage Dictionary of the English Language 11 (3d ed. 1992)). The Doyle court also examined the dictionary definition of negligence, which was defined as " 'failure to exercise the degree of care considered reasonable under the *552 circumstances, resulting in an unintended injury to another party.'" Id. at 289-90 (quoting The American Heritage Dictionary, supra, at 1209). The court noted that both definitions "center on an unintentional occurrence leading to undesirable results," and the court concluded that "a reasonable insured would expect.. . [a policy] provision defining 'event' to include negligent acts." Id. at 290 (emphasis added).[14]
¶ 57. In American Girl we interpreted a CGL policy to determine whether the policy provided coverage for property damages resulting from an alleged occurrence. Am. Girl, 268 Wis. 2d 16, ¶¶ 1-3. In American Girl a subcontractor "gave faulty site-preparation advice to a general contractor in connection with the construction of a warehouse. As a result, there was excessive *553 settlement of the soil after the building was completed," and the warehouse was so damaged that it had to be torn down. Id., ¶ 3. Once again, the CGL policy defined occurrence as an accident, but the policy did not define accident. Id., ¶ 37.
¶ 58. As in Doyle, the American Girl court turned to dictionaries for help in interpreting the term accident:
The dictionary definition of "accident" is: "an event or condition occurring hy chance or arising from unknown or remote causes." Webster's Third New International Dictionary of the English Language 11 (2002). Black's Law Dictionary defines "accident" as follows: "The word 'accident,' in accident policies, means an event which takes place without one's foresight or expectation. A result, though unexpected, is not an accident; the means or cause must be accidental." Black's Law Dictionary 15 (7th ed. 1999).
Id. (emphasis added). In light of these definitions, the American Girl court concluded that the circumstances in the case constituted an occurrence under the policy: the property damage was "clearly not intentional," nor was it "anticipated by the parties." Id., ¶ 38. More specifically:
The damage to the [warehouse] occurred as a result of the continuous, substantial, and harmful settlement of the soil underneath the building. [The] inadequate site-preparation advice was a cause of this exposure to harm. Neither the cause nor the harm was intended, anticipated, or expected. We conclude that the circumstances of this claim fall within the policy's definition of "occurrence."
Id. (emphasis added) (footnote omitted).[15]
*554 ¶ 59. In Everson we reviewed whether misrepresentation in a real estate transaction constituted an occurrence under a CGL policy. Everson, 280 Wis. 2d 1, ¶ 2. After the transaction, the buyers determined that a portion of their lot was in a 100-year floodplain, contrary to the representations made by the seller in a real estate condition report given to the buyers.[16] Id., ¶ 5. As a result, the buyer was unable to build on that location. Id. The buyer sued the seller, but the seller's insurer argued that it had no duty to defend and indemnify under its CGL policy to the seller. Id., ¶ 7. The CGL policy covered property damage caused by an occurrence. The policy defined the term "occurrence" as an accident, but "accident" was not defined. Id., ¶¶ 12, 15. Thus, the Everson court had to determine whether the seller's alleged misrepresentation constituted an accident and triggered coverage under the CGL policy.
¶ 60. Noting that "this court has often relied on dictionary definitions for assistance," the Everson court looked to Black's Law Dictionary, which defined an "accident" as " '[a]n unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could not be reasonably anticipated.' " Id., ¶ 15 (quoting Black's Law Dictionary 15 (7th ed. 1999)). The court also cited the Doyle court's definition of "accident": " '[a]n unexpected, undesirable event' or 'an unforeseen incident' which is characterized by a 'lack of intention.'" Id. (quoting Doyle, 219 Wis. 2d at 289).
*555 ¶ 61. Ultimately, the Everson court concluded that the seller's misrepresentations did not constitute an accident. Id., ¶ 18. The seller's misrepresentation required a "degree of volition inconsistent with the term accident." Id., ¶ 19 (citing Sheets v. Brethren Mut. Ins. Co., 679 A.2d 540, 552-53 (Md. 1999) (Karwacki, J., dissenting)) (emphasis added). The seller may have made a mistake in a real estate condition report when he initially placed the lot outside of the 100-year floodplain. Id., ¶¶ 5 n.3, 22. However, the seller later acted with volition when he intentionally gave this information to the buyer. Id., ¶ 22 (emphasis added). "[Stripped to its essentials," an action, not an accident, caused the seller to give misleading information to the buyer. Id.
¶ 62. Finally, in Estate of Sustache, we reviewed an occurrence case somewhat similar to this matter. Estate of Sustache involved a fight at an underage drinking party in which the insured punched a victim, causing the victim to fall to a curb and sustain severe injuries that ultimately led to death. Estate of Sustache, 311 Wis. 2d 548, ¶ 5. There was no dispute that the insured assaulter intended to strike the victim, but there was also no dispute that the insured assaulter did not intend the blow to be fatal. Id. The estate and parents of the victim sued the assaulter and his insurer, American Family, which moved for summary judgment on the grounds that, inter alia, the damages were not caused by an occurrence under the policy. Id., ¶¶ 6, 12. Once again, the policy defined an "occurrence" as an accident, but the policy did not define the term "accident." Id., ¶ 9.
¶ 63. After reviewing our previous analysis of the term "occurrence" in Doyle, American Girl, Everson, and Stuart v. Weisflog's Showroom Gallery, Inc., 2008 *556 WI 86, 311 Wis. 2d 492, 753 N.W.2d 448, we held in Estate ofSustache that the allegations in the complaint, supplemented by the deposition of the insured assaulter, could not "reasonably be construed to constitute a covered claim" under the American Family policy. Id., ¶ 51.
¶ 64. Considering one of the Doyle definitions of "accident" — "an unintentional occurrence leading to undesirable results" — we concluded that the insured's actions did not constitute an accident. The insured may not have intended the unexpected result, but he did intend to throw the punch that ultimately led to the death of the victim. Id., ¶¶ 52-53 (quoting Doyle, 219 Wis. 2d at 290). American Girl's definition of "accident" also reinforced our conclusion. The means or cause of the victim's bodily harm was an intentional punch; the punch could not be said to occur by chance or arise from an unknown or remote cause. Id., ¶ 53 (citing Am. Girl, 268 Wis. 2d 16, ¶ 37). We also noted that, like the misrepresentation in Everson, the insured assaulter's action required a degree of volition inconsistent with the term "accident." Id., ¶ 54 (citing Everson, 280 Wis. 2d 1, ¶ 19).
¶ 65. With the above cases and their interpretations of an insurance policy's requirement of an "occurrence" or "accident" in mind, we turn to the facts of this case.
¶ 66. At the outset, we must determine where to focus our analysis. More specifically, what is the injury-causing event in this case? Is it Cecil's assault on Schinner, or is it the actions of Gundrum in hosting the party? In this case, as opposed to a case against Cecil, Schinner's Second Amended Complaint alleges that wrongful conduct by Gundrum caused his bodily injury. Normally, the allegations in a complaint are the allega *557 tions an insurer must defend or indemnify, and it is these alleged facts that determine whether there is coverage under the homeowner's policy. See Doyle, 219 Wis. 2d at 284-85. Here, the circuit court considered additional evidence, but the additional evidence did not undermine or change the thrust of the allegations in the complaint.
¶ 67. There is no question that Cecil intended to assault Schinner. Schinner does not contend that Gun-drum intended or approved of Cecil's assault or that he ever wanted to see Schinner injured.
¶ 68. However, the allegations in Schinner's Second Amended Complaint and other evidence make clear that Gundrum took a number of intentional actions that ultimately caused Schinner's bodily injury. Gundrum intended to host the party and, based on the experience from an earlier party he hosted, he intended that the "individuals he invited would invite other youths, who would in turn invite others." Gundrum intended that minors attend his party. He "knew and expected that a substantial number of individuals" were under the legal drinking age and that these underage attendees would consume alcohol made available to them at the party. By making the arrangements for beer pong throughout the evening, Gundrum actively promoted heavy drinking at the party. In violation of Chapter 125 of the Wisconsin Statutes, Gundrum procured alcohol for Cecil and other minors. Gundrum knew that Cecil was an underage individual who became belligerent when intoxicated. Nonetheless, Gundrum "encouraged, advised and assisted Cecil in his consumption of alcohol." Gundrum's actions in hosting an underage drinking party and in procuring alcohol for Cecil and others were intentional. See Doyle, 219 Wis. 2d at 290 (concluding that an "accident" is an "unintentional occurrence leading to undesir *558 able results") (emphasis added). Gundrum's actions were entirely volitional. He did not host the underage drinking party by mistake, against his will, or by chance. See Everson, 280 Wis. 2d 1, ¶ 19.
¶ 69. As we stated in American Girl, "A result, though unexpected, is not an accident; the means or cause must be accidental." Am. Girl, 268 Wis. 2d 16, ¶ 37 (citation omitted). Here, "the means or cause" of Schinner's bodily injury was not accidental. The intentional, illegal procuring and serving of alcohol to Cecil exposed Schinner to harm. Gundrum's many intentional acts were a substantial factor in causing Schinner's bodily injury. The events leading up to the bodily injury were not remote and were not accidental.
¶ 70. As a general rule, where an insured acts intentionally to cause bodily injury to another, insurance coverage for the injury will not be available. This case is more difficult because bodily injury was not intended and there was no certainty that it would occur. On the other hand, bodily injury was hardly unforeseeable. All the conditions for a tragic injury had been put in place, and they were put in place intentionally. As the Michigan Supreme Court concluded in an insurance coverage case dealing with an occurrence, "when an insured's intentional actions create a direct risk of harm, there can be no liability coverage for any resulting damage or injury, despite the lack of an actual intent to damage or injure." Frankenmuth Mut. Ins. Co. v. Masters, 595 N.W.2d 832, 839 (Mich. 1999) (quoting Auto Club Grp. Ins. Co. v. Marzonie, 527 N.W.2d 760, 771 (Mich. 1994) (Griffin, J., concurring)).
¶ 71. Given the facts of this case, it is not reasonable to argue that a fight between intoxicated teenagers was "unexpected" or "unforeseen," Doyle, 219 Wis. 2d at *559 289, especially when one of the underage drinkers was known to become belligerent when he was drunk. Gundrum anticipated that something undesirable, like a fight, might happen at his party: he stopped drinking when he realized the increasing number of guests attending the party along with the amount of alcohol being consumed created a volatile situation. It is no leap of logic to conclude that Gundrum knew that a combination of underage partygoers, alcohol, and games like beer pong would create a powder keg. To aggravate this already volatile situation, Gundrum heard Schinner's pleas to intervene and stop the relentless taunting he was receiving from Cecil who had a reputation for belligerence when he was intoxicated.
¶ 72. Schinner urges us to adopt an approach in determining an occurrence like the approach taken by the Minnesota Supreme Court in American Family Insurance Co. v. Walser, 628 N.W.2d 605 (Minn. 2001). In that case, three youths were playing in a high school gym, when one of them, Jewison, jumped up and hung from the rim of the basketball hoop. Id. at 607. The other two pulled on Jewison's ankles several times until finally he fell and suffered bodily injury. Id. Jewison sued the other two youths, Walser and Shoemaker, but Walser's insurer, American Family, argued it had no duty to defend or indemnify Walser because there was no occurrence under Walser's homeowner's policy. Id. at 608. The definition of occurrence in the American Family policy was identical to the homeowner's policy in this case — "an accident," which the policy did not define. Id. at 609.
¶ 73. The Minnesota Supreme Court held that "in analyzing whether there was an accident for purposes of coverage, lack of specific intent to injure will be determinative, just as it is in an intentional act exclusion analysis." Id. at 612. Thus, the court concluded *560 that while Walser acted intentionally — pulling at Jewison's ankles while he hung from the basketball hoop — Walser did not act with specific intent to injure Jewison, thereby constituting an occurrence and triggering coverage under the American Family policy. Id. at 613. The court also concluded that, since the three youths were merely "goofing around," that both Jewison and Walser had hung on the basketball rim before and fallen to the ground without injury, and that Walser's actions were merely impulsive actions resulting in unintentional injury, the intentional acts exclusion did not apply. Id. at 614-15.
¶ 74. We have two reservations about applying Walser to the present situation. First, our insurance case law does not require that an insured intend to harm, or know with substantial certainty that harm will occur, in order to determine that the harm was not an accident. An accident is "an unintentional occurrence leading to undesirable results." Doyle, 219 Wis. 2d at 290. To assess the existence of an accident, a court will focus on the "means or cause" of harm to determine whether it was truly accidental, even if the result was unexpected. Am. Girl, 268 Wis. 2d 16, ¶ 37. Here, there was intentional conduct in throwing the illegal underage drinking party and encouraging Cecil to drink when Gundrum had knowledge of Cecil's aggressive behavior when intoxicated. Intent, volition, knowledge, and foreseeability are all present, consistent with our case law. Gundrum's conduct was not accidental, so no occurrence triggered coverage under the homeowner's policy.
¶ 75. Second, Gundrum's conduct and Schinner's injury differ greatly from the conduct and injury in Walser. While the actions of the three youths in Walser were described as "goofing around" and "impulsive," *561 Gundrum was doing more than "goofing around." Gun-drum planned a large drinking party, procured alcohol for minors, knew of Cecil's belligerence, and encouraged Cecil's consumption of alcohol. We believe that the facts of this case — intentionally providing alcohol to minors, resulting in bodily injury — are closer to the facts in a Minnesota Court of Appeals case, Illinois Farmers Insurance Co. v. Duffy, 618 N.W.2d 613 (Minn. Ct. App. 2000).[17]
¶ 76. Schinner also contends that the lack of a liquor exclusion in the homeowner's policy is important in this case. He argues that since other homeowner policies contain liquor exclusions,[18] and West Bend *562 could have put one in its policy, this court should not rewrite the contract to help West Bend avoid coverage. Schinner also points to the presence of a liquor exclusion in the CGL policy for Gundrum Trucking.[19] If West Bend anticipated liquor liability coverage under the CGL policy and specifically excluded it, he argues, then surely the homeowner's policy was expected to cover liquor liability in the absence of such an exclusion. We are not persuaded.
¶ 77. CGL policies typically contain an exclusion for liquor liability. See, e.g., 1 Anderson, supra, at § 5.187; 9A Lee R. Russ, Thomas F. Segalla, Steven Plitt, Daniel Maldonado, & Joshua D. Rogers, Couch on Insurance § 129:32 (3d ed. 2005). However, these same treatises say nothing about the frequency of liquor liability exclusions in homeowner's policies. Although Schinner cites one Wisconsin case[20] to support his assertion that these exclusions are common to homeowner's policies, the absence of an exclusion does not necessarily mean the presence of coverage.
¶ 78. As noted above, the first step in a court's analysis of an insurance contract is to examine whether the policy provides an initial grant of coverage. See, supra, ¶ 37. Hence, if a given set of facts do not trigger coverage, it is not necessary to look at a policy's exclusions. West Bend could have inserted a liquor liability exclusion into the policy, but we would not have reached it under the facts of this case because Gundrum's intentional and illegal conduct did not lead to coverage.
*563 ¶ 79. Finally, we note the strong public policy weighing against finding an occurrence in this situation. As this court stated in Hedtcke v. Sentry Insurance Co., 109 Wis. 2d 461, 326 N.W.2d 727 (1982):
Even where the insurance policy contains no language expressly stating the principle of fortuitousness, courts read this principle into the insurance policy to further specific public policy objectives including (1) avoiding profit from wrongdoing; (2) deterring crime; (3) avoiding fraud against insurers; and (4) maintaining coverage of a scope consistent with the reasonable expectations of the contracting parties on matters as to which no intention or expectation was expressed.
Hedtcke, 109 Wis. 2d at 484 (citing Keeton, Insurance Law § 5.3(a) at 279 (1971)). See also 7 Steven Plitt, Daniel Maldonado, Joshua D. Rogers, & Jordan R. Plitt, Couch on Insurance § 101:22 (3d ed. 2006) ("In general, it is against public policy for an insurance contract to provide coverage for the intentional or willful misconduct of an insured."); 43 Am. Jur. 2d Insurance § 478 (2003) ("Public policy does on occasion demand that a wrongdoer be forbidden to shift the cost of liability to another through insurance . . . .").
¶ 80. Finding an occurrence and coverage under these circumstances would allow the host to escape responsibility for his intentional and illegal actions. We would be sending the wrong message about underage drinking parties, implying that whatever tragic consequences might occur, insurance companies will be there to foot the bill. Moreover, insurance contracts are construed from the standpoint of what a reasonable person in the position of the insured would believe the contract to mean. Acuity v. Bagadia, 2008 WI 62, ¶ 13, 310 Wis. 2d 197, 750 N.W.2d 817; Liebovich v. Minn. Ins. Co., 2008 WI 75, ¶ 17, 310 Wis. 2d 751, 751 N.W.2d *564 764. We do not believe that a reasonable insured would expect coverage for bodily injury resulting from the hosting of a large, illegal underage drinking party.
¶ 81. We conclude that Gundrum's intentional actions in hosting a large underage drinking party— actions that were illegal — and providing alcohol to an individual known to become belligerent when intoxicated, were a substantial factor in causing Schinner's bodily injury. These causes were not accidental. Since there was no occurrence under the homeowner's policy, there was no initial grant of coverage to Gundrum under the policy.
B. The Exclusion for "Arising Out Of' a Non-Insured Location
¶ 82. Ordinarily, if we find no initial grant of coverage under an insurance policy, we end our inquiry. See supra, ¶ 37. In this case, however, the court of appeals' interpretation of the non-insured location exclusion has been published and should be addressed.
¶ 83. The homeowner's policy contained an exclusion for bodily injury or property damage liability arising out of a premises that is not an "insured location" (or a premises used by the insured "in connection with" an "insured location.") "Coverages E and F do not apply to the following:... 'Bodily injury' or 'property damage' arising out of a premises: a. Owned by an 'insured'; b. Rented to an 'insured'; or c. Rented to others by an 'insured'; that is not an 'insured location'." (Emphasis added.)
¶ 84. The parties dispute the meaning of the phrase "arising out of." West Bend argues that this phrase means, in the context of a general liability *565 insurance policy, "originating from, growing out of, or flowing from." Garriguenc v. Love, 67 Wis. 2d 130, 137, 226 N.W.2d 414 (1975). West Bend argues that the plain language of the exclusion precludes coverage because Schinner's injuries arose out of the shed and the Gun-drums did not use the shed "in connection with" their insured residence. Schinner and the court of appeals disagree with this interpretation, relying on Newhouse v. Laidig, Inc., 145 Wis. 2d 236, 426 N.W.2d 88 (Ct. App. 1988).
¶ 85. In Newhouse, an unsupervised child was injured when he became entangled in a silo unloader. Id. at 238. The defendant's homeowner's policy excluded coverage for bodily injury "arising out of any premises owned or rented to any insured which is not an insured location." Id. at 239. The farm silo was not an insured location. Id.
¶ 86. The Newhouse court found the non-insured location exclusion did not apply, and the homeowner's policy provided coverage to the farm owner. Id. at 239-40. Newhouse relied on a Missouri decision, Lititz Mutual Insurance Co. v. Branch. Lititz involved a similar "arising out of' exclusion, but the court held that the bodily injury in that case did not occur as a result of "a condition" of the non-insured location. Lititz Mut. Ins. Co. v. Branch, 561 S.W.2d 371, 374 (Mo. Ct. App. 1977). Newhouse adopted this approach: "The dispositive issue therefore is whether there is some correlation between the negligence giving rise to liability and a condition of the premises." Newhouse, 145 Wis. 2d at 240 (emphasis added).
¶ 87. Newhouse did not cite the Garriguenc case, which discussed the same "arising out of' language. The Garriguenc court said: "The words 'arising out of in liability insurance policies are very broad, general, and *566 comprehensive; and are ordinarily understood to mean originating from, growing out of, or flowing from. All that is necessary is some causal relationship between the injury and the event [here, "property"] not covered." Garriguenc, 67 Wis. 2d at 137 (footnote omitted).
¶ 88. The Newhouse court provided a much narrower reading of the "arising out of' exclusion than the Garriguenc court. In effect, it attempted to overrule the Garriguenc decision. We think a better reading of the exclusion is not to exclude all liability coverage for events not on an insured premises but rather to exclude liability coverage when there is a "causal relationship" between the premises that are not insured and the insured's action or non-action giving rise to liability. Cf. St. Paul Fire & Marine Ins. Co. v. INA, 501 F. Supp. 136, 138 (WD. Va. 1980) (stating that "arising out of' are words of much broader significance than "caused by" and are usually understood to mean "incident to or having connection with").
¶ 89. In this case, the homeowner's policy language is clear on its face. The policy excludes coverage for injuries arising out of a non-insured premises, not from a condition of a non-insured premises. Schinner's bodily injury clearly arose out of, or originated, or flowed from, the shed where the illegal party took place on the premises of Gundrum Trucking, a non-insured location.
¶ 90. In this case, a causal relationship between the shed and Schinner's injury is present. A portion of the shed was set up for a social gathering, especially an underage drinking party: chairs, tables, couch, a refrigerator, a CD player, and a Ping-Pong table for beer pong. The shed had no windows, thereby concealing the illegal activities inside. As counsel for West Bend aptly *567 observed at oral argument for summary judgment, "It was an illegal party. . . . [Tjhat's not the kind of thing one could have rented out the Knights of Columbus Hall to do. Or to have done out in your front yard at your residence. This had a causal nexus to the premises."
C. Whether the Shed was a Premises Used in Connection With an Insured Location
¶ 91. Finally, Schinner advances the argument that the shed was in fact an insured location because it was used "in connection with" the Gundrum's insured residence. Schinner points to the storage of the Gun-drums' insured personal property, like snowmobiles, to turn the shed into an insured location.[21] Such an assertion defies common sense. If business owners were allowed to store insured personal property on their business premises and obtain insurance coverage for the premises through a homeowner's policy, there would be much less reason to obtain business insurance. Such a result would be absurd. Olguin v. Allstate Ins. Co., 71 Wis. 2d 160, 165, 237 N.W.2d 694 (1976) ("[I]nsurance policies should be given a reasonable interpretation and not one which leads to an absurd result."); Wilson Mut. Ins. Co. v. Risler, 2011 WI App 70, ¶ 12, 333 Wis. 2d 175, 798 N.W.2d 898 ("We reject interpretations of insurance policies that lead to absurd results.").
*568 V CONCLUSION
¶ 92. Gundrum's actions in setting up an isolated shed for a drinking party, procuring alcohol and expecting others to bring alcohol, inviting many underage guests to the party, and encouraging the underage guests to drink — especially an underage guest known to become belligerent when intoxicated — were intentional actions that violated the law. Gundrum's many intentional wrongful acts were a substantial factor in causing Schinner's bodily injury. Viewed from the standpoint of a reasonable insured, Gundrum's intentional actions created a direct risk of harm resulting in bodily injury, notwithstanding his lack of intent that a specific injury occur. Thus, Schinner's bodily injury was not caused by an "occurrence" within the meaning of the policy, and West Bend is not obligated to provide insurance coverage for Gundrum.
¶ 93. Even assuming there was an occurrence under the West Bend homeowner's policy, coverage is excluded because the injury arose out of the use of an isolated shed for an underage drinking party on uninsured premises. The fact that the Gundrums kept some personal property insured under the policy at the shed did not make the shed a premises used in connection with the insured's residence, as those terms are defined in the policy. Thus, the business shed was not an insured location triggering coverage under the homeowner's policy.
By the Court. — The decision of the court of appeals is reversed.

 Schinner v. Gundrum, 2012 WI App 31, 340 Wis. 2d 195, 811 N.W.2d 431.

 Circuit Judge James G. Pouros, presiding.

 The parties, the circuit court, and the court of appeals have referred to the insurance company as "West Bend Insurance Company" and 'West Bend Mutual Insurance Company."

 The highway, or automobile, portion of the policy is not relevant to this case.

 The homeowner's policy stated, "Coverages E and F do not apply to the following:... 'Bodily injury' or 'property damage' *537 arising out of a premises: a. Owned by an 'insured'; b. Rented to an 'insured'; or c. Rented to others by an 'insured'; that is not an 'insured location'."
The homeowner's policy also contained an exclusion for intentional injury, stating that coverage did not apply to " '[bjodily injury' or 'property damage' which is expected or intended by an 'insured'."

 West Bend issued the CGL policy to HJSG Enterprises, but the CGL policy does not refer to Gundrum Trucking.
The record includes a printed copy of the Wisconsin Department of Financial Institutions (DFI) corporate record for Gun-drum Trucking, Inc., with its principal office on Arthur Road, Slinger, presumably as proof of how HJSG Enterprises publicly conducted its business, or that HJSG is a parent entity of Gundrum Trucking, Inc. However, the DFI record for Gundrum Trucking, Inc. does not refer to HJSG Enterprises. Moreover, a search of DFI corporate records reveals a Scott Gundrum Trucking, LLC, also listing its principal office on Arthur Road in Slinger. For the sake of simplicity, we will refer to the entity conducting business on Arthur Road near Slinger as Gundrum Trucking.

 At his deposition, Gundrum testified that his father was aware of small gatherings of friends at the shed, but that he told Gundrum to "[u]se [his] judgment" and "to not have big parties."

 According to Schinner's testimony at the preliminary hearing in Cecil's criminal assault case, beer pong is a game in which cups are set up on opposite ends of a Ping-Pong table. Teams of participants attempt to toss or bounce Ping-Pong balls into one of the other team's cups. If successful, the other team must drink the beer in that cup.
While there are many variations of the rules of beer pong, "the common object is the copious consumption of alcoholic beverages." Venito v. Salverson, No. 104110/08, 2011 WL 2464760, at *2 (N.Y. Sup. June 21, 2011). See also Kirchoff v. Abbey, No. WMN-10-1532, 2011 WL 4711898 at *1 n.2 (D. Md. Oct. 5, 2011) ("Beer pong is a game that encourages players to drink heavily.").

 According to various accounts by Schinner and witnesses, Cecil referred to Schinner as a "pussy," "homo," and "fag."

 Schinner testified at the preliminary hearing in Cecil's criminal case that he suffered spinal cord damage as a result of the assault, and while Schinner has regained some movement in his arms and legs, he is "considered quadriplegic."
The record does not indicate what criminal charges Cecil faced as a result of the Schinner assault. The investigating sheriffs deputy indicated in his supplemental report on the assault that he would be requesting charges against Cecil for battery, with intent to cause either substantial or great bodily harm, contrary to Wis. Stat. § 940.19(2) (2007-08). The deputy also recommended a hate crime penalty enhancer under Wis. Stat. § 939.645(l)(b) (2007-08).
According to Consolidated Court Automation Programs (CCAP) records, Cecil pled no contest to a charge of substantial battery with intent to cause bodily harm, contrary to Wis. Stat. *541 § 940.19 (2007-08). Another charge, second-degree recklessly endangering safety, contrary to Wis. Stat. § 941.30(2) (2007-08), was dismissed but read in.

 Gundrum pled no contest to a charge of selling or dispensing alcohol to underage persons, contrary to Wis. Stat. § 125.07(1) (a) (2007-08).

 "Both the insurer and the insured have the right to have the court resolve the issue of coverage separate from any trial on liability." Estate of Sustache v. Am. Family Mut. Ins. Co., 2008 WI 87, ¶ 26, 311 Wis. 2d 548, 751 N.W.2d 845; see also 2 Arnold P Anderson, Wisconsin Insurance Law § 7.39, at 39 (6th ed. 2012).

 The court later explained the theater's position:
The appellant is subject to the liability for damages flowing from the tortious conduct of its employee. This liability is imposed upon [the] assured by law under the rule of respondeat superior. Although the appellant may be held liable for such tort, it cannot be said that it committed the assault, nor that it authorized it. Thus the appellant has not placed itself outside the terms of the policy....
*549 Fox Wis. Corp. v. Century Indem. Co., 219 Wis. 549, 551-52, 263 N.W 567 (1935).

 Relying on dram shop law in Chapter 125 of the Wisconsin Statutes, Schinner argues that furnishing alcohol to a minor in Wisconsin is negligent, not intentional, conduct. He asserts that because negligence can constitute an occurrence under an insurance policy, Doyle v. Engelke, 219 Wis. 2d 277, 290, 580 N.W.2d 245 (1998), Gundrum's furnishing of alcohol to minors was negligent and should trigger coverage.
We reject this argument. The facts alleged in a complaint or as supplemented by affidavits determine a duty to defend and trigger coverage under an insurance policy, not a plaintiffs theories of liability. See, e.g., Doyle, 219 Wis. 2d at 284-85 (stating that the insurer has a duty to defend where the plaintiffs complaint alleges facts that would give rise to liability under a policy); Berg v. Schultz, 190 Wis. 2d 170,177,526 N.W.2d 781 (Ct. App. 1994) (courts "must focus on the incident or injury that gives rise to the claim, not the plaintiffs theory of liability").
Furthermore, an allegation of negligence is not the equivalent of an occurrence. Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 2004 WI 2, ¶ 45, 268 Wis. 2d 16, 673 N.W.2d 65 ("Doyle did not... equate the term 'accident,' as used in the CGL policy, with negligence as a form of legal liability; we simply held that negligent acts were 'accidental' within the meaning of the CGL's definition of 'event.'").

 See also Stuart v. Weisflog's Showroom Gallery, Inc., 2008 WI 86, 311 Wis. 2d 492, 753 N.W2d 448. The Stuart court adopted American Girl's requirement that the underlying causal event must be accidental for the event to be an occur *554 rence, not the unexpected result. Id., ¶ 40. "It does not matter whether [the defendants] intended a specific result; what matters is whether the cause of the damage was accidental." Id.

 The real estate condition report appeared to have contained a typographical error that the buyer relied upon when purchasing a particular lot. Everson v. Lorenz, 2005 WI 51, ¶ 16, 280 Wis. 2d 1, 695 N.W.2d 298.

 The Minnesota Supreme Court's decision in American Family Insurance Co. v. Walser, 628 N.W.2d 605 (Minn. 2001), did not specifically overrule the Minnesota court of appeals decision cited by West Bend in this case, Illinois Farmers Insurance Co. v. Duffy, 618 N.W.2d 613 (Minn. Ct. App. 2000), review denied (Jan. 26,2001). In fact, the Walser decision did not even mention Duffy. In Duffy, the Minnesota Court of Appeals held that the intentional act of providing alcohol to minors was wrongful conduct and did not constitute an occurrence under a homeowner's insurance policy. Duffy, 618 N.W.2d at 615.
It is not surprising that Duffy is still good law. The Duffy court and courts in other states have found no accident, or no occurrence, under a homeowner's policy when an insured intentionally or knowingly provides alcohol to a minor and injury results. See, e.g., Am. Modern Home Ins. Co. v. Corra, 671 S.E.2d 802, 806-07 (W Va. 2008) (holding that there is no occurrence and a homeowner's policy does not provide coverage when injury is caused by an insured's conduct in "knowingly permitting" a minor to consume alcohol on the insured's property); Allstate Ins. Co. v. J.J.M., 657 N.W.2d 181, 184 (Mich. Ct. App. 2002) (concluding that the insured "reasonably should have expected that giving minors enough alcohol to allow them to pass out would result in harm" and thus no accident giving rise to coverage existed).

 As an example of a homeowner's policy containing a liquor exclusion, Schinner cites Anderson v. American Family *562 Mutual Insurance Co., 2002 WI App 315, 259 Wis. 2d 413, 655 N.W.2d 531.

 The written summary judgment decision in this case mistakenly placed the liquor exclusion in the homeowner's policy, not the CGL policy.

 See supra, n.18.

 The shed was used to store personal property for Gundrum's extended family. If Schinner's argument were valid, the shed would be used "in connection with" more than one residence. Tortfeasors from several residences would be able to claim coverage.