Joshua Oddsen, as Special Administrator of
the Estate of Jason Thomas Oddsen,
Carolyn Oddsen and Mark Oddsen,
Plaintiffs-Appellants,

v.

Elizabeth Henry and ABC Insurance Company,
n/k/a State Farm Fire & Casualty Company,
Defendants-Respondents,

DEF Insurance Company, Brian Hoffman, GHI
Insurance Company, JKL Insurance Company,
Christopher Cavanaugh, MNO Insurance
Company and PQR Insurance Company,
Defendants.

Court of Appeals

*No. 2015AP765. Oral argument January 26,
2016.—Decided March 16, 2016.*

2016 WI App 30

(Also reported in 878 N.W.2d 720.)

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Christopher L. Strohbehn*, *Kathryn A. Keppel*, and *Emily I. Lonergan* of *Gimbel, Reilly, Guerin & Brown LLP*, Milwaukee. There was oral argument by *Emily I. Lonergan*.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Mark D. Malloy* and *Matthew V. Fisher*, Milwaukee. There was oral argument by *Mark D. Malloy*.

Before Neubauer, C.J., Reilly, P.J., and Hagedorn, J.

¶ 1. NEUBAUER, C.J. The estate and parents of Jason Oddsen appeal the circuit court's summary judgment in favor of State Farm Fire & Casualty Company. The court found that State Farm has no continuing duty to defend or duty to indemnify its insured, Elizabeth Henry, under a condominium unit owner's policy, for tort claims alleging Henry was negligent in failing to render or obtain aid for Oddsen, who died from acute mixed drug intoxication. The material facts regarding Henry's tort liability—her knowledge and actions—are disputed and, as such, State Farm's motion for summary judgment seeking a declaration of no coverage must be denied.

¶ 2. On the night of February 2, 2010, Oddsen went to the home of Christopher Cavanaugh to watch a basketball game with Kyle Walters, Brian Hoffman, and Henry. During the course of the party, Oddsen, who was a regular abuser of drugs, consumed a mixture of heroin, methadone, oxycodone, and alprazolam that proved fatal early the next morning. Oddsen began to show signs of having overdosed while staying at the home of Henry's mother. It is largely this time period, when Oddsen first began exhibiting signs of having overdosed to when Henry sought emergency assistance, that is critical for purposes of deciding whether Henry is still entitled to a defense, and ultimately, perhaps indemnity, in the action Oddsen's estate brought against her under a condominium unit owner's insurance policy State Farm issued to Henry's mother. Yet, there are, as State Farm states in its brief, "two distinct versions of the events" that led up to Oddsen's death. Oddsen's estate claims that at ap-

proximately 4:00 a.m., Henry noticed that Oddsen was having difficulty breathing, but that she did not contact the police until more than two hours later. Henry, however, claims that she did not notice anything wrong with Oddsen until 5:45 a.m., when he abruptly stopped snoring. She woke him, and he was groggy but responsive. Henry talked Oddsen into going to the hospital to "make sure that everything [was] ok," and, as he was putting on his shoes, he slumped over and was unresponsive. A few minutes later, Henry contacted 911.

¶ 3. The circuit court granted State Farm summary judgment declaring that it has no continuing duty to defend or duty to indemnify Henry. The circuit court concluded that public policy and a lack of an "occurrence" precluded coverage, a conclusion the circuit court based on its "important" finding that Henry's "failure to obtain aid was not an accident," that her actions were "intentional" in doing "nothing over a period of several hours as Jason Oddsen perished before her eyes." These facts were disputed and, as such, State Farm's motion for summary judgment must be denied.

## BACKGROUND

### The Allegations of the Complaint

¶ 4. Joshua Oddsen, as special administrator of the estate of Jason Oddsen, along with Oddsen's parents, Carolyn Oddsen and Mark Oddsen (the Estate), commenced this action against, among others, Henry, alleging that Hoffman and Cavanaugh provided Oddsen with "numerous controlled and uncontrolled substances including . . . [a]lprazolam,

325

[o]xycodone, [h]eroin and [m]ethadone."[1] Oddsen began acting incoherently while at Cavanaugh's house, causing Henry, Cavanaugh and Hoffman to become concerned about him. After Oddsen regained consciousness, Henry drove Oddsen to her home in the village of Hartland, arriving there sometime between 1:00 a.m. and 1:30 a.m.

¶ 5. The Estate's complaint alleges that, starting at approximately 4:00 a.m., Henry noticed that Oddsen was having difficulty breathing. Instead of calling "authorities," she called a number of acquaintances, including Hoffman and Cavanaugh, using Oddsen's phone. About one hour later, Henry again spoke with Hoffman who responded to her by trying to ride his bicycle to her residence. While in route, Hoffman was stopped by police and taken to a park-and-ride. Hoffman did not mention to police that there was an emergency at Henry's residence. Using Oddsen's car, Henry drove to the park-and-ride to pick up Hoffman, leaving Oddsen at her residence.

¶ 6. When Henry and Hoffman returned back to her residence, they "negligently attempted to render aid to Oddsen." They then dragged him outside Henry's residence and into the driveway. Hoffman and a neighbor contacted 911. Paramedics arrived, rendering emergency aid to Oddsen before taking him to the hospital where, at 7:28 a.m., he was pronounced dead. The Estate alleges claims against Henry based on her "negligent attempt to render aid."[2]

---

[1] We take these allegations from the amended complaint.

[2] State Farm initially moved for summary judgment on its intervenor complaint but was directed to rebrief the issue of

## State Farm Accepts Henry's Tender of Defense Under a Reservation of Rights

¶ 7. Henry tendered a defense of this action to State Farm under a condominium unit owner's policy it issued to Henry's mother. State Farm accepted Henry's tender under a reservation of rights. State Farm moved to intervene in the action and to bifurcate and stay the underlying merits from the issue of coverage: State Farm's motion to intervene was granted, and the motion to bifurcate and stay was held in abeyance pending anticipated motions on coverage. State Farm filed an intervenor complaint, alleging that it had no duty to defend or indemnify Henry.

## Henry's Deposition Testimony

¶ 8. Meanwhile, discovery progressed. Henry was deposed and testified that Oddsen was a regular user of opiates, although February 2 was the first time she saw him using heroin. Oddsen was "high" about "every other day," and, if he was not high, then he was in withdrawal, Henry testified. When Henry first saw Oddsen that day at around 3:00 p.m., he was not exhibiting any signs of withdrawal and so she assumed he had consumed drugs earlier that day. Oddsen showed Henry a bag and told her it contained heroin. Although Henry never saw Oddsen consume heroin that night, she knew that he had done so. Oddsen might have taken other drugs, she said, but she did not know for sure. She noticed that there were half-straws in the loft of Cavanaugh's home, which she knew were used to snort pills. Towards the end of the night,

coverage after the Estate was granted permission to amend the complaint to remove the allegation that Henry had provided Oddsen with drugs.

Oddsen appeared intoxicated. He was falling asleep and not talking much, which was "so usual" for him.

¶ 9. Around 12:00 a.m., Oddsen left with Henry, Hoffman, and Walters. Oddsen had no difficulty breathing and was able to walk to his car. Although he was still intoxicated, he started driving. He was "swerving on the road," going "in and out" of consciousness. Ultimately, Henry convinced Oddsen to let her drive. They arrived at her mother's home around 2:00 a.m. Later, she saw Oddsen crushing a pill, which turned out to be trazodone, but she told him that he had had enough, and he relented.

¶ 10. Over the next couple hours, Henry was up several times, and Oddsen might have gotten up to use the bathroom once. Hoffman called Henry multiple times, and he was asking strange questions, such as why was Oddsen snoring so loudly.[3] Hoffman said he would come to Oddsen and Henry, but Henry told him not to come. Henry called Cavanaugh to tell him that Hoffman kept calling her. Cavanaugh, she testified, could hear Oddsen snoring, but she did not think anything was wrong with Oddsen. Cavanaugh said to "ignore it" and that Oddsen was "fine."

¶ 11. At some point, Oddsen stopped snoring. Henry woke him, and he was pale and groggy but responsive. She suggested that they go to the hospital to "make sure that everything's ok." Initially, he refused, but when she threatened to call 911, he agreed to go. They walked down the stairs to the front door, and Oddsen started putting on his shoes. Oddsen slumped down and was complaining about leaving when he then became unresponsive.

---

[3] According to phone records, between 4:02 a.m. and 5:42 a.m., there were twenty phone calls from Oddsen's phone.

¶ 12. By then Henry had opened the front door to find Hoffman outside in the driveway pacing. Hoffman had insisted on coming over and had ridden his bicycle there. Henry and Hoffman tried to get Oddsen inside his car, but he was too heavy. "[W]ithin that same couple minutes," Henry called 911.[4] She thought about thirty or forty-five minutes might have passed from when Oddsen stopped snoring to when she had called 911. She explained that she had initially decided against calling 911 because Oddsen was walking and talking, and he did not want help. She denied that she delayed in calling 911 because she did not want to get in trouble. She did not recall calling Hoffman and expressing concern over swelling of Oddsen's face, and denied that she left to pick up Hoffman, or that Oddsen was unconscious when she allegedly came back with Hoffman. She acknowledged that she told the police a different story, but she said she just panicked.

### Cavanaugh's Deposition Testimony

¶ 13. Like Henry, Cavanaugh testified that Oddsen was a habitual drug user. Oddsen was using opiates almost every day, and Cavanaugh had seen him using heroin hundreds of times. In the last year of his life, Oddsen was ingesting a mixture of drugs like oxycodone, alprazolam, or methadone. It was common sense that mixing drugs was dangerous, and Oddsen knew this because he and Cavanaugh had talked about acquaintances that had died from mixing drugs. Oddsen was incoherent every day, and it was "very, very noticeable."

---

[4] According to police records, the police responded to the scene at approximately 6:30 a.m.

¶ 14. On February 2, Oddsen consumed methadone, oxycodone, alprazolam, and heroin.[5] Afterwards, Oddsen was incoherent but not asleep, and he never lost consciousness. Oddsen was spilling food on himself and nodding in and out, but this was normal for him. Around 9:30 or 10:00 p.m., when Cavanaugh's girlfriend arrived home, Oddsen, Henry, Hoffman, and Walters left. Oddsen was able to walk and talk, and, while he was the most intoxicated person there, he was nevertheless "coherent enough to get up and . . . drive three people home."[6]

¶ 15. Around 3:30 or 4:00 a.m., Henry called Cavanaugh from Oddsen's phone—she may have called earlier, but Cavanaugh was sleeping—and she said that Oddsen was breathing "funny." Henry was "frantic." Henry held up the phone to Oddsen's mouth so that Cavanaugh could hear. Cavanaugh told her that Oddsen was a heavy sleeper or snorer, which is what it sounded like to him. He advised Henry that if she was really concerned she should wake up her mother or Oddsen's mother or call an ambulance.

*Hoffman's Written Statement to Police*

¶ 16. Hoffman gave a written statement to police stating that when they left Cavanaugh's residence, Oddsen's condition was no where near life-

---

[5] Cavanaugh testified that Oddsen had brought alprazolam and heroin with him. Later that night, when Cavanaugh asked Oddsen what he had taken, he said alprazolam, heroin, and methadone. At another point in his deposition, Cavanaugh testified that Oddsen also consumed oxycodone by snorting it.

[6] Cavanaugh testified that Henry consumed alprazolam and, he thought, heroin because she went up to the loft with Oddsen and, when she came back down, she was behaving differently. Henry testified that she only took alprazolam, which was under a doctor's prescription.

threatening. He was alert and was able to drive Hoffman home on the other side of town. Later, Henry called Hoffman, but did not tell him about the seriousness of Oddsen's condition. Henry told Hoffman that Oddsen was "alert and talking," but this was a lie. Henry picked up Hoffman in Oddsen's car. Once at Henry's house, Hoffman walked up the stairs and saw Oddsen. Hoffman checked Oddsen's pulse and then immediately started giving him CPR. Foam was coming from Oddsen's mouth, and he was making a gargling noise. Oddsen was cold to the touch, his lips were a blue, purple color, and his skin was gray. Oddsen had feces on his pants. Henry, Hoffman said, only "cared about getting [Oddsen] outside so her mom [did not] hear." Henry and Hoffman started taking Oddsen to the car, but he was too heavy to lift, so Hoffman dialed 911 and handed the phone to Henry so that she could give the operator her address. Henry told Hoffman to run across the street as the ambulance arrived. Hoffman did not know if Henry was not thinking clearly, but "she was in a panic about getting in trouble the whole time."

## State Farm's Policy

¶ 17. Under Henry's mother's policy, State Farm agreed to defend and indemnify its insured if suit is brought "for damages because of bodily injury . . . to which this coverage applies, caused by an occurrence."[7] The policy defines an "occurrence" as "an accident, including exposure to conditions, which results in: a. bodily injury . . . during the policy period." Coverage, however, is excluded for bodily injury when it is

---

[7] It is undisputed that Henry is considered an "insured" under the State Farm policy.

"either expected or intended by the insured; or . . . which is the result of willful and malicious acts of the insured."

## State Farm's Motion for Summary Judgment

¶ 18. State Farm moved for summary judgment on its intervenor complaint, arguing that it had no duty to defend or indemnify Henry because she had committed a series of volitional acts that led to Odd-sen's death and, thus, there was no "occurrence" or "accident." Alternatively, if the circuit court were to find that there was an initial grant of coverage, then the intentional acts exclusion barred coverage. Finally, the principle of fortuity and Wisconsin public policy precluded coverage.

## The Circuit Court's Decision

¶ 19. The circuit court granted State Farm's motion, holding that public policy and the lack of an occurrence precluded coverage. The court reasoned as follows:

> [T]his court finds here, [] although it may have never been [Henry's] intent to let Oddsen die, I do find there were certain intentional actions on the part of Henry which contributed to Oddsen's death, and that includes not calling 911 sooner. A reasonable insured cannot expect that her insurance company would provide coverage while what [Henry] did here was to do nothing over a period of several hours as her friend, who had consumed a large amount of illegal drugs in her presence earlier in the evening, perished before her very eyes.
>
> . . . .

Returning to occurrence[,] [t]his court finds that there is no occurrence and thus no initial grant of coverage. This court finds that Henry's failure to obtain aid was not an accident. Plaintiff certainly encouraged this court to find that Henry's acts constituted negligence because they fell below the standard of care, but this court finds that the actions on [Henry's] part were nonetheless intentional actions . . . .

I want to note, at least the way I read the plaintiff's material, the plaintiff does not dispute nor could the plaintiff dispute that Oddsen's death was from the consumption of drugs, which, in effect, was foreseeable. The fact that Henry did nothing over a period of several hours, as Jason Oddsen perished before her eyes, is important to this court in its findings. At some point she intentionally left Oddsen alone in her room so she could pick up Hoffman for assistance. At some point she drags Oddsen down the stairs to the driveway. Finally calls 911. The court finds that these choices were all intentional.

## ANALYSIS

### *The Parties' Contentions*

¶ 20. The Estate contends that Henry's actions in failing to render aid to Oddsen were not intentional or volitional but an occurrence, meaning an accident, and, thus, fall within coverage under the State Farm policy. Pointing largely to the complaint, but also some extrinsic evidence, the Estate contends that Henry took some action to render aid to Oddsen, in calling friends, in picking up Hoffman to help her, in trying to get him to the hospital, and in ultimately calling 911. Her "liability is not in wanting [Oddsen] to die, but in falling below the standard of care in the manner in which she rendered aid." Thus, the ex-

333

pected or intended acts exclusion does not exclude coverage because the record is devoid of any evidence that Henry intended to injure Oddsen. Henry's failure to render aid was merely negligent and not intentional.

¶ 21. State Farm acknowledges that at this posture, where it has provided a defense to Henry under a reservation of rights, the "four-corners rule" no longer governs and that "[t]his Court can look beyond the allegations in the [c]omplaint to determine if there is, in fact, any coverage under the terms of the [p]olicy." Nevertheless, State Farm cites to the amended complaint and proceeds to argue that there is no indemnity coverage "on the basis that the allegations of [the Estate's] complaint are true."

¶ 22. State Farm contends that it is entitled to a declaration of no indemnity coverage for Henry based on the allegations of the Estate's complaint because the Estate has conceded that if Henry's version is true then this lawsuit could not have been brought, since Henry would be entitled to immunity under Wisconsin's Good Samaritan law. *See* WIS. STAT. § 895.48(1) (2013–14).[8] Characterizing the facts in the amended complaint as thus "undisputed," State Farm argues that they show that Henry committed a "series of volitional acts" that led up to Oddsen's overdose, making it not an accident. This was not an accident because the Estate alleges Henry was "participating in a party with the knowledge that [Oddsen], an addict, was consuming illegal drugs for seven to eight hours, and then fail[ed] to call authorities to avoid getting in trouble when [Oddsen] became unresponsive." This is

---

[8] All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

not a case of Henry merely being present at a party but, as the Estate alleges, and the circuit court found, she participated in a party where she stood idly by while Oddsen ingested drugs that killed him, and she later did nothing to help him for several hours while he "perished before her eyes."

¶ 23. State Farm further argues that, even if this court were to find that there was an initial grant of coverage, it would be excluded by the intentional or expected acts exclusion. Under the Estate's theory of liability, Oddsen exhibited signs of overdose over the course of several hours, which Henry intentionally ignored in order to avoid getting into trouble. From these "undisputed facts," as alleged in the complaint, it may be inferred as a matter of law that no reasonable person could have engaged in Henry's conduct without believing that some harm would be substantially certain to follow.

*Standard of Review and Summary*
*Judgment Methodology*

¶ 24. The procedure this court uses in reviewing a motion for summary judgment is the same as that of the circuit court and has been set forth in "numerous cases." *Grams v. Boss*, 97 Wis. 2d 332, 338, 294 N.W.2d 473 (1980), *overruled on other grounds by Meyers v. Bayer AG*, 2007 WI 99, 303 Wis. 2d 295, 735 N.W.2d 448; *see Riccitelli v. Broekhuizen*, 227 Wis. 2d 100, 110, 595 N.W.2d 392 (1999). Initially, the court examines the pleadings to determine if a claim has been stated and whether a material issue of fact is presented. *Grams*, 97 Wis. 2d at 338. If the complaint states a claim and the pleadings show the existence of factual

335

issues, then the court examines the moving party's affidavits or other proof to determine if the moving party has made a prima facie case for summary judgment under Wis. Stat. § 802.08(2). *Grams*, 97 Wis. 2d at 338. "If the moving party has made a prima facie case for summary judgment," the court then examines "the affidavits and other proof of the opposing party . . . to determine whether there exists disputed material facts, or undisputed material facts from which reasonable alternative inferences may be drawn, sufficient to entitle the opposing party to a trial." *Id.*

¶ 25. The moving party has the burden to establish the absence of a genuine, that is, disputed, issue as to any material fact. *Id.* Our job is clear: "On summary judgment the court does not decide the issue of fact; it decides whether there is a genuine issue of fact." *Id.* "A summary judgment should not be granted unless the moving party demonstrates a right to a judgment with such clarity as to leave no room for controversy." *Id.*

¶ 26. Thus, the papers are "carefully scrutinized," and the nonmoving party is entitled to the benefit of all favorable facts and reasonable inferences drawn in his or her favor. *See id.* at 339. Should the material presented on the motion be subject to conflicting interpretations or if reasonable people might differ as to its significance, then summary judgment must be denied. *Id.* On summary judgment, the allegations in the complaint are not evidence. *See Krezinski v. Hay*, 77 Wis. 2d 569, 572, 253 N.W.2d 522 (1977).

¶ 27. At the initial duty to defend stage, the duty of an insurer to defend its insured "is determined by comparing the allegations of the complaint to the terms of the insurance policy," known as the "four-corners rule." *See Estate of Sustache v. American Family Mut. Ins. Co.*, 2008 WI 87, ¶¶ 20, 24, 28, 311 Wis. 2d 548, 751 N.W.2d 845. Normally, the four-corners rule is "stated as a rule in which the insurer's duty to defend is determined 'without resort to extrinsic facts or evidence.'" *Id.*, ¶ 27 (citation omitted). However, as State Farm and the Estate both acknowledge, we are beyond the four-corners rule because State Farm has provided Henry with a defense under a reservation of rights. *See Olson v. Farrar*, 2012 WI 3, ¶¶ 26, 34, 338 Wis. 2d 215, 809 N.W.2d 1 (where insurer had provided a defense to insured under a reservation of rights, the four-corners rule was no longer implicated). The court, thus, proceeds to a determination of coverage. *Id.*, ¶ 34.

¶ 28. A determination of coverage means a determination on the duty to indemnify, that is, whether the claim is within the parameters of the policy and the insured is liable. *Id.*, ¶ 29; *Reid v. Benz*, 2001 WI 106, ¶ 19, 245 Wis. 2d 658, 629 N.W.2d 262; *see Acuity v. Chartis Specialty Ins. Co.*, 2015 WI 28, ¶ 27 n.21, 361 Wis. 2d 396, 861 N.W.2d 533 (citing 14 STEVEN PLITT ET AL., COUCH ON INSURANCE § 200:3 at 200–10 (3d ed. 1997) ("[T]he duty to indemnify arises only once liability has been conclusively established."). In making the determination of coverage, the court may consider extrinsic evidence. *Olson*, 338 Wis. 2d 215, ¶¶ 35–37; *Sustache*,

311 Wis. 2d 548, ¶¶ 28–29. At times, the facts are undisputed and the circuit court can decide the issue of indemnity coverage as a matter of law based on its interpretation of the policy at issue, but, "at other times, the facts bearing on coverage are disputed, and coverage cannot be determined until these factual disputes are resolved in the circuit court." *Olson*, 338 Wis. 2d 215, ¶ 36.

¶ 29. In determining whether there is coverage under the terms of an insurance policy, we first examine whether the policy's insuring agreement makes an initial grant of coverage, that is, whether the insurer has a duty to indemnify its insured for the claims asserted. *Id.*, ¶ 41; *Sustache*, 311 Wis. 2d 548, ¶ 22. If the claim triggers an initial grant of coverage, then the court examines the various exclusions to determine whether any exclusion precludes coverage. *Olson*, 338 Wis. 2d 215, ¶ 41. If so, then the court determines if there is an exception to the exclusion which reinstates coverage. *Id.*

*Occurrence and Intentional Act Exclusion*

¶ 30. As already noted, the State Farm policy provides coverage "for damages because of bodily injury . . . caused by an occurrence," which is defined as "an accident." Accident itself is undefined in the State Farm policy; thus, we apply the term's common everyday meaning, that is, " '[a]n unexpected, undesirable event' or 'an unforeseen incident' which is characterized by a 'lack of intention.' " *Doyle v. Engelke*, 219 Wis. 2d 277, ¶ 23, 580 N.W.2d 245 (1998) (alteration in original; citation omitted). An

338

accident includes coverage for negligence. *See Sustache*, 311 Wis. 2d 548, ¶ 34. Whether an injury is accidental is viewed from the standpoint of the insured. *See Schinner v. Gundrum*, 2013 WI 71, ¶ 52, 349 Wis. 2d 529, 833 N.W.2d 685.

¶ 31. The intentional or expected acts exclusion precludes coverage only where the insured acts intentionally and intends some harm or injury to follow from that act. *See Liebovich v. Minnesota Ins. Co.*, 2008 WI 75, ¶ 52, 310 Wis. 2d 751, 751 N.W.2d 764; *Loveridge v. Chartier*, 161 Wis. 2d 150, 168, 468 N.W.2d 146 (1991). An insured intends to injure or harm another if he or she "intends the consequences of his [or her] act, or believes that they are substantially certain to follow." *Loveridge*, 161 Wis. 2d at 168 (citation omitted). Thus, intent may be subjective or objective. *Id.* Under the latter standard, even if the insured asserts, honestly or dishonestly, that he or she did not intend any harm, coverage is precluded if the intentional act is substantially certain to produce injury. *Id.* Further, "even if the harm that occurs is different in character or magnitude from that intended by the insured," the exclusion precludes coverage. *Id.* at 169. Ordinarily, whether an insured subjectively or objectively intended harm or injury to result from an intentional act is a question of fact, although "in narrow circumstances" that determination can be made as a matter of law. *Id.* at 169–70.

*State Farm is Not Entitled to Summary Judgment*

¶ 32. Here, the circuit court erroneously granted State Farm summary judgment declaring that Henry is not entitled to coverage. The "accident" alleged in

the Estate's complaint is that Henry's negligent failure to render aid resulted in his death. Central to the court's determination that Henry's actions were intentional, and not negligent, was its finding that Henry did "nothing over a period of several hours as her friend, who had consumed a large amount of illegal drugs in her presence earlier in the evening, perished before her very eyes." These are disputed issues of material fact that must be resolved by the trier of fact. *See Olson*, 338 Wis. 2d 215, ¶ 36.

¶ 33. As noted above, State Farm largely relies on the allegations in the complaint. Starting at approximately 4:00 a.m., Henry noticed that Oddsen was having difficulty breathing. Instead of calling "authorities," she called Hoffman, who responded by riding his bicycle to her home. Henry, without Oddsen, picked up Hoffman and returned to her residence where she and Hoffman belatedly attempted to render aid to Oddsen.[9]

¶ 34. Henry's version of the events, however, was quite different, testifying that while Oddsen was putting on his shoes in the doorway after having agreed to go with Henry to the hospital, he suddenly collapsed. She and Hoffman tried to get Oddsen into his car in order to drive him to the hospital, and then she called 911 "within that same couple minutes."

¶ 35. Henry also testified that, while she was aware that Oddsen had consumed heroin, she did not see him doing so, nor did she know for sure whether he

---

[9] State Farm also relies on discrete facts from the summary judgment submissions, including Hoffman's statement to the police. Neither party addresses whether the statement is admissible on summary judgment, but because it is not necessary to our conclusion that other disputed issues of material fact preclude summary judgment, we need not address that issue.

took other drugs. Thus, her testimony indicates that she did not know how much heroin he consumed, or about the drugs Cavanaugh testified Oddsen consumed and the autopsy revealed. She also denied taking any drugs other than her own prescription drugs. She denied going to get Hoffman in the middle of the night, and she denied that she was motivated by a desire to avoid getting in trouble. The fact finder at trial may believe the allegations in the complaint, if supported by the evidence presented at trial; the fact finder may believe Henry's testimony; or it may find that the facts lie somewhere between those two versions, given the testimony of others, such as Cavanaugh and Hoffman.

¶ 36. Before the circuit court, and again on appeal, State Farm seeks to avoid a trial on Henry's tort liability and obtain a declaration of no coverage by largely relying on the allegations of the complaint—the Estate's alleged case if proven would establish that Henry's actions were not an occurrence and were intentional. State Farm justifies this approach by arguing that, if Henry's account is to be believed, the Estate would not have brought this lawsuit because she would have been entitled to immunity under the Good Samaritan law. Thus, the Estate argues, "Henry's deposition testimony should [not] be taken at face value."[10] State Farm contends that the complaint's alleged facts or Henry's deposition testimony point only to one of two outcomes, either intentional

[10] Henry, who was represented by independent defense counsel, did not oppose State Farm's coverage motion. Henry, however, never moved for summary judgment dismissing the complaint against her on the basis that she was immune from liability under Wisconsin's Good Samaritan law.

conduct precluded under the policy, or immune conduct and therefore no liability, but not negligence.

¶ 37. In effect, State Farm asks us to determine indemnity coverage for Henry based on a hypothetical outcome on liability, rather than on the evidence submitted on summary judgment. To some extent, the Estate goes along with the hypothetical approach, relying both on some of the allegations of the complaint, while pointing to some of Henry's deposition testimony that is favorable to its negligence claim and ignoring that which might hurt the Estate's claim.

¶ 38. Neither State Farm nor the Estate provide any authority for us to determine coverage *for the insured* based on the insurer's and the plaintiff's preferred hypothetical outcomes on liability when the facts are disputed. The parties provide no authority for their suggestion that we could pick and choose which allegations and facts to rely on to either find no coverage for the insured as a matter of law, or no underlying liability of the insured as a matter of law, when the allegations of the complaint are not evidence and the facts of record on summary judgment create disputed issues of material fact.[11] Thus, we reject State Farm's approach which ignores disputed issues of fact. *See Schinner*, 349 Wis. 2d 529, ¶¶ 10, 66 (where the insurer had defended insured under a reservation of

---

[11] While State Farm contends that the Estate conceded that Henry's version of events would support a Good Samaritan defense, the Estate argues that Henry's version is also not completely true, and her actions would thus amount to negligence. Again, neither party points to authority permitting us to rely on alleged concessions of the plaintiff as to whether the insured defendant's testimony supports or does not support liability, much less for us to defer to these parties' chosen versions of the facts to determine liability as a matter of law, rather than all the evidence in the record.

rights and the matter had proceeded to discovery, the court considered additional evidence including the insured's deposition testimony concluding that it "did not undermine or change the thrust of the allegations in the complaint").

¶ 39. As discussed above, the evidence in the record as to whether Henry's actions were negligent or intentional is disputed. As to the claimed immunity from liability under the Good Samaritan law, State Farm failed to adequately develop this issue, including an application of the elements of this defense to the facts of record. In any event, the facts are disputed as to Henry's knowledge and actions prior to her 911 call and Oddsen's physical state. Again, Cavanaugh and Hoffman relay that Henry was frantic, aware of Oddsen's dire consequences for hours, and wanted to avoid getting into trouble. Henry has denied that she delayed in calling 911 because she did not want to get in trouble—a delay that was mere minutes under her version—creating disputed issues of fact as to whether her conduct was negligent, or amounted to emergency care rendered at the scene of the emergency, and if so, whether it was rendered in "good faith." *See* WIS. STAT. § 895.48(1); *Mueller v. McMillian Warner Ins. Co.*, 2006 WI 54, ¶ 23, 290 Wis. 2d 571, 714 NW.2d 183.

¶ 40. In short, discovery has revealed that there are disputed issues of fact as to whether Henry's conduct was intentional or accidental, making summary disposition of whether State Farm has a duty to indemnify Henry inappropriate. State Farm agreed to defend Henry under a reservation of rights, meaning that until there is a determination that State Farm has no duty to indemnify Henry, it has a continuing duty to defend her. *See* SHEILA SULLIVAN, ET AL., ANDERSON ON WISCONSIN INS. LAW, § 7.40 (7th ed. 2015); *See Radke*

*v. Fireman's Fund Ins. Co.*, 217 Wis. 2d 39, 44–45, 577 N.W.2d 366 (Ct. App. 1998).

### Remaining Public Policy Contention Based on the Insurance Agreement

¶ 41. The circuit court granted State Farm's motion partially on the ground that public policy barred coverage for Henry's "intentional actions." Again, the circuit court's resolution of this issue hinged on its choosing among disputed facts, which was inappropriate on a motion for summary judgment. *See Ackerman v. Hatfield*, 2004 WI App 236, ¶ 15, 277 Wis. 2d 858, 691 N.W.2d 396. Since the facts are disputed, and since a fact finder could find that Henry's actions in rendering aid to Oddsen were merely negligent or accidental, and not intentional, public policy would not weigh against finding an occurrence under the insurance policy. *Cf. Schinner*, 349 Wis. 2d 529, ¶ 79 (holding that it would be against public policy to allow coverage for the insured's intentional and illegal actions in hosting a large, underage drinking party and providing alcohol to an individual known to become belligerent when intoxicated).

### The Dissent's Public Policy Argument

¶ 42. Our dissenting colleague argues that the circuit court should have dismissed the Estate's complaint on public policy grounds, meaning that Oddsen's own actions in causing his death should cut off any liability of Henry. No one ever asked for that relief. While we have the power to raise an argument sua sponte, *see Bartus v. DHSS*, 176 Wis. 2d 1063, 1071, 501 N.W.2d 419 (1993); *see also Leonard v. State*, 2015

WI App 57, ¶ 13, 364 Wis. 2d 491, 868 N.W.2d 186, it is a power we exercise sparingly, and for good reason. *See Cemetery Servs., Inc. v. Wisconsin Dep't of Regulation & Licensing,* 221 Wis. 2d 817, 831, 586 N.W.2d 191 (Ct. App. 1998) (noting that we generally choose not to decide issues that are inadequately developed because "[w]e cannot serve as both advocate and court"); *see also United States v. Burke,* 504 U.S. 229, 246 (1992) (Scalia, J., concurring) ("The rule that points not argued will not be considered is more than just a prudential rule of convenience; its observance, at least in the vast majority of cases, distinguishes our adversary system of justice from the inquisitorial one."). The rule of law is generally best developed when issues are raised by the parties and then tested through adversarial briefs. Even when a court sees a dispositive issue that the parties neglected, intentionally or otherwise, the better course is to permit the parties additional briefing. *See Bartus,* 176 Wis. 2d at 1073 (urging courts "to exercise caution when determining an issue sua sponte without the assistance of supplemental briefs and to ask for briefs unless the matter is quite clear"). But, our dissenting colleague would go even further, not merely raising a new argument, but would move for summary judgment on Henry's behalf. In doing so, our dissenting colleague would deprive the Estate of the statutorily required twenty-day notice and an opportunity to bring forth all of its evidence in opposition. *See* Wis. Stat. § 802.08(2); *see also Larry v. Harris,* 2008 WI 81, ¶ 43, 311 Wis. 2d 326, 752 N.W.2d 279. This would be error. *Harris,* 311 Wis. 2d 326, ¶ 43.

## CONCLUSION

¶ 43. The circuit court should not have granted State Farm summary judgment declaring that it has

no continuing duty to defend or duty to indemnify Henry. Discovery has shown that there are disputed issues of fact, which must be resolved by a fact finder before it can be determined whether State Farm is obligated to indemnify Henry. Until such time, State Farm has a continuing duty to defend Henry in the underlying tort lawsuit.

*By the Court.*—Order reversed and cause remanded for further proceedings.

¶ 44. REILLY, P.J. (*dissenting*). I respectfully dissent on two grounds. First, and foremost, public policy precludes liability as Elizabeth Henry was not the proximate cause of Jason Oddsen's death; and, second, under the terms of State Farm's policy, Oddsen's death was not caused by an "occurrence."

## BACKGROUND

¶ 45. On February 2, 2010, Oddsen, an undisputed drug addict, consumed methadone during the day, and then shortly after arriving at Christopher Cavanaugh's apartment, he voluntarily ingested oxycodone, heroin, and alprazolam.[1] Oddsen drifted in and out of consciousness during the evening, although his friends were unconcerned as Oddsen's "being incoherent and nodding in and out was an everyday thing." Elizabeth later stated that she regularly saw Oddsen consume pills and observed that if Oddsen was not high on drugs, he was exhibiting signs of withdrawal. Oddsen knew the risks of his drug abuse as he and Cavanaugh had discussed his addiction when they saw

---

[1] The Waukesha county medical examiner determined that Oddsen died from acute mixed drug intoxication after finding heroin, methadone, oxycodone, and alprazolam in his blood.

346

reports of others dying of drug overdoses on the news. Each time Oddsen said, "I can handle it, I'm under control." Despite Oddsen's assertion, he "was always literally like always under the influence," and Cavanaugh had "told our friends that one day we're going to find [Oddsen] dead." Approximately one year before Oddsen's death, Cavanaugh told Oddsen's mother that Oddsen needed help.

¶ 46. Oddsen's mother, Carolyn Oddsen, an emergency room nurse and emergency medical technician instructor, knew that Oddsen was a drug addict. Oddsen's father was a corrections officer.[2] Oddsen's parents sent him to a drug treatment center during high school. Oddsen's parents witnessed him "falling asleep into his dinner plate" at the dinner table. Oddsen's parents witnessed him lose his job due to his drug use when he fell asleep in a hallway and failed to deliver a pizza. Oddsen's parents received a call from him one night saying that he was stranded because his keys would not work in his car, but when Oddsen's mother came to pick him up, she discovered that Oddsen was trying to drive someone else's vehicle.

¶ 47. When Oddsen and Elizabeth left Cavanaugh's home, Oddsen was the driver. When Oddsen later experienced trouble breathing, Elizabeth tried to convince him to go to the hospital, but Oddsen refused. I respectfully submit that Oddsen was the proximate cause of his own death.

## PUBLIC POLICY

¶ 48. Whether public policy acts as a bar to a claim in any given case is a question of law that this court decides de novo. *Fandrey v. American Family*

---

[2] For reasons unstated, Oddsen's father is not listed as a party on the plaintiffs' amended complaint.

*Mut. Ins. Co.*, 2004 WI 62, ¶ 6, 272 Wis. 2d 46, 680 N.W.2d 345. When "public policy" is used in the context of precluding tort liability, the term is being used as a synonym for "proximate cause." *Id.*, ¶ 10. " 'Proximate cause' involves public policy considerations and is a question of law solely for judicial determination." *Id.*, ¶ 12 (citation omitted).

¶ 49. The undisputed fact is that Oddsen voluntarily ingested powerful, addictive, illegal, and known lethal drugs, and he alone is legally responsible for his actions. Oddsen (via his Estate) and his family now seek to profit from Oddsen's voluntary choices. Oddsen took the lethal dose of drugs, and he alone declined Elizabeth's offer to take him to the hospital. While Wisconsin has adopted the minority view from *Palsgraf*[3] that everyone owes a duty to the world at large, that duty is restricted by what is "reasonable under the circumstances." *Hocking v. City of Dodgeville*, 2009 WI 70, ¶ 12, 318 Wis. 2d 681, 768 N.W.2d 552. It is undisputed that Oddsen was a drug addict traveling a path to a foreseeable death. If Elizabeth is "a" cause of Oddsen's death, then so are Oddsen's family, friends, and all who knew that Oddsen was a drug addict. While we all may share in the moral failure to save Oddsen's life, it is only Oddsen who bears the legal cause for his death.

¶ 50. When a court precludes liability based on public policy factors, it is making a finding that despite the existence of cause-in-fact—in this case Elizabeth's failure to get help—the cause of the plaintiff's injuries is not legally sufficient to allow recovery. *Fandrey*, 272 Wis. 2d 46, ¶ 13. "Public policy" is inexorably tied to legal cause in Wisconsin. *Id.*, ¶ 15. We utilize public

---

[3] *Palsgraf v. Long Island R. R. Co.*, 162 N.E. 99 (N.Y. 1928).

policy in order to assure that "in cases so extreme that it would shock the conscience of society to impose liability, the courts may step in and hold as a matter of law that there is no liability." *Id.*, ¶ 15 (citation omitted).

¶ 51. The application of public policy factors to a specific set of facts to deny recovery is a question of law that courts decide de novo. *Id.*, ¶ 29. I will assume for purposes of public policy analysis that Elizabeth was "a" cause of Oddsen's death and I will also assume Oddsen's death was caused by an "occurrence" as that term is used in the State Farm policy. The six public policy factors are:

> (1) the injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tortfeasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden on the negligent tortfeasor; or (5) because allowance of recovery would be too likely to open the way for fraudulent claims; or (6) allowance for recovery would enter a field that has no sensible or just stopping point.

*Alwin v. State Farm Fire & Cas. Co.*, 2000 WI App 92, ¶ 12, 234 Wis. 2d 441, 610 N.W.2d 218 (citation omitted). "Liability may be denied solely on the basis of one of the factors." *Fandrey*, 272 Wis. 2d 46, ¶ 29.

¶ 52. In my opinion, all of the factors apply. Given that I am in the dissent, I shall not fully analyze the factors but simply offer the following: Elizabeth and her insurer did not cause Oddsen's ingestion of known lethal drugs and Oddsen refused Elizabeth's offer to take him to the hospital. Had Elizabeth run away from her addict friend earlier in the evening, she

would not have been liable—but because she stayed with her sick friend and adhered to his wishes, she finds herself liable.

¶ 53. It is not reasonable under the facts presented to hold Elizabeth legally responsible for Oddsen's voluntary choices. Oddsen's family, friends, and society were all aware of and, under the *Hocking* view, at fault for not stopping Oddsen's death spiral. It is not reasonable under the circumstances that Oddsen's Estate and his mother should profit from Oddsen's voluntary bad choices. Legal liability lies solely and only upon Oddsen; moral responsibility lies in a different court of justice. I would dismiss the Estate's complaint.

## INSURANCE CONTRACT INTERPRETATION

¶ 54. Oddsen's death was no accident—it was an occurrence nearly certain to happen given the voluntary choices Oddsen made to ingest lethal drugs. The insurance policy at issue in this case provides coverage for any claim or suit "against an insured for damages because of bodily injury or property damage . . . caused by an occurrence." An occurrence is defined as an "accident," including repeated or continuous exposure to the same general conditions, resulting in bodily injury or property damage. In other words, this is a standard liability policy providing coverage for accidental injuries or damages, a concept that has been explored repeatedly and at length by our courts over the years.

¶ 55. In *Stuart v. Weisflog's Showroom Gallery, Inc.*, 2008 WI 86, 311 Wis. 2d 492, 753 N.W.2d 448, our supreme court defined "accident" as "an event which takes place without one's foresight or expectation." *Id.*,

¶ 40 (citation omitted). Under this definition, " '[a] result, though unexpected, is not an accident'; rather, it is the causal event that must be accidental for the event to be an accidental occurrence." *Id.* The analysis of whether an accident has occurred focuses on whether the conduct that caused the injury was accidental. *Id.* The conduct that caused Oddsen's injury was no accident—it was Oddsen's voluntary ingestion of lethal drugs.

¶ 56. The court expanded upon this explanation more recently in *Schinner v. Gundrum*, 2013 WI 71, 349 Wis. 2d 529, 833 N.W.2d 685. In *Schinner*, Gundrum hosted an underage drinking party and invited a guest that he knew became belligerent when drunk. *Id.*, ¶ 2. The belligerent guest was permitted to drink anyway, and he assaulted and seriously injured Schinner. *Id.* Schinner sued Gundrum and Gundrum's insurance company for his injuries. *Id.* The insurance contract in that case defined "accident" similarly to the State Farm policy in this case. *See id.*, ¶ 13. The *Schinner* court found that coverage was precluded as Schinner's bodily injury was not caused by an "occurrence" within the meaning of Gundrum's insurance policy. *Id.*, ¶ 8. Gundrum "did not host the underage drinking party by mistake, against his will, or by chance," and he engaged in a series of volitional acts that led up to the assault on Schinner. *Id.*, ¶¶ 68–69. "All the conditions for a tragic injury had been put in place, and they were put in place intentionally." *Id.*, ¶ 70.

¶ 57. I am persuaded by these cases that Oddsen and his mother have not alleged an "occurrence" that triggers coverage under State Farm's policy. The only "event" that arguably could be said to have occurred "without one's foresight or expectation" was Oddsen's

death. *See Stuart*, 311 Wis. 2d 492, ¶ 40. Every action taken by Elizabeth—from Elizabeth's knowledge of Oddsen ingesting large quantities and varied types of drugs to Elizabeth's keeping Oddsen at her home rather than taking him to a hospital and her subsequent failure to request medical help—were a series of volitional acts on the part of both Oddsen and Elizabeth that led to Oddsen's death. *See Schinner*, 349 Wis. 2d 529, ¶¶ 68–69. Even though Oddsen's death might have been accidental, the causal events were not, and, therefore, there was no accidental occurrence under State Farm's policy. *See Stuart*, 311 Wis. 2d 492, ¶ 40.

¶ 58. Appellants argue that Elizabeth's actions are the "accident" in this case because she did not intend for Oddsen's condition to worsen. As *Schinner* explains, however, "our insurance case law does not require that an insured intend to harm, or know with substantial certainty that harm will occur, in order to determine that the harm was not an accident." *Schinner*, 349 Wis. 2d 529, ¶ 74. I accept as undisputed that Elizabeth and Oddsen made a series of bad choices that ended when Oddsen died on Elizabeth's doorstep. Their bad choices were not an "accident"— they were a series of volitional acts that were commenced and jointly continued by Oddsen and Elizabeth and therefore not an "occurrence" under State Farm's policy.

¶ 59. For the forgoing reasons, I would affirm the circuit court's dismissal of State Farm.