Archie A. TALLEY, Plaintiff-Appellant,

v.

Mustafa MUSTAFA, d/b/a Burleigh Liquor, a/k/a Burleigh Food Market and Adams Foods, LLC, Defendants,

AUTO OWNERS INSURANCE COMPANY, Defendant-Respondent.†

Court of Appeals

*No. 2015AP2356. Submitted on briefs August 17, 2016.
—Decided April 5, 2017.*

2017 WI App 31

(Also reported in 897 N.W.2d 55.)

† Petition for Review Filed.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *George E. Chaparas* of *Carlson, Blau & Clemens, S.C.*, Milwaukee.

On behalf of the defendant-respondent, the cause was submitted on the brief of *William R. Wick* and *Justin F. Wallace* of *Nash, Spindler, Grimstad & Mc-Cracken LLP*, Manitowoc.

Before Reilly, P.J., Gundrum and Hagedorn, JJ.

¶ 1. GUNDRUM, J. Archie Talley appeals from an order granting Auto Owners Insurance Company's (Auto Owners') motion for summary and declaratory

judgment and dismissing Auto Owners from this action. The circuit court determined Auto Owners does not owe Mustafa Mustafa or the other named defendants a duty of defense or indemnification in relation to an alleged altercation at Mustafa's business, Burleigh Food Market (the store), on July 24, 2009.[1] According to the court, the complaint and factual record indicate that if defendant "John Doe"—an alleged "agent[], employee[], or representative[]" of Mustafa—struck Talley, it was done intentionally, and because the injury to Talley was caused by an intentional act, there is no coverage under Mustafa's Auto Owners insurance policy.

¶ 2. We conclude the circuit court erred in granting summary and declaratory judgment to Auto Owners and dismissing it from this action. Talley's complaint alleged Mustafa negligently trained and supervised "John Doe," who the parties subsequently identified as Keith Scott.[2] Based upon the language of

---

[1] Talley brought this action against Mustafa Mustafa, d/b/a N & L Burleigh Liquor a/k/a Burleigh Food Market, and Adams Foods, LLC. Adams Foods owns Burleigh Food Market, and Mustafa, the sole owner of Adams Foods, runs the market. Mustafa owns the building where the market is located and leases it to Adams Foods. For the purposes of this decision, we will occasionally refer to these defendants collectively and Mustafa Mustafa individually as "Mustafa."

[2] The parties appear to all acknowledge that "John Doe," the individual who allegedly struck Talley on July 24, 2009, was a man named Keith Scott. In his deposition testimony, Scott testified he was not in an altercation with Talley on that date and did not "know anything about" and had "nothing to do with" this incident. Whether Scott is the person who allegedly struck Talley is a factual question. Because the parties on appeal appear to agree Scott is the individual Talley references as "John Doe" in his complaint, we will refer to John Doe as Scott in this decision.

the policy at issue, a reasonable insured in the position of Mustafa would expect to be covered for such a claim, whether founded upon a negligent or intentional underlying act by Scott. On a related matter addressed by the parties, we conclude there is a genuine issue of material fact as to whether Scott was an employee of Mustafa or otherwise had a special relationship with him such that Mustafa had a duty to train and supervise Scott with due care. We reverse and remand for further proceedings.

## Background

¶ 3. Talley filed a complaint against Mustafa and Mustafa's insurance company, Auto Owners, alleging that while Talley was at the store on July 24, 2009, Scott, an "agent[], employee[] or representative[]" of Mustafa, began a verbal altercation with Talley and then struck him twice, fracturing his jaw. Talley alleged Mustafa was negligent with regard to his "duty to properly train and supervise" Scott, and his breach of this duty resulted in Talley's injuries.

¶ 4. Following discovery, Auto Owners moved for declaratory and summary judgment on the basis that Scott's alleged injury-causing conduct did not qualify as an "occurrence" covered under the policy or, alternatively, that coverage was excluded because the injury to Talley was "expected or intended" and thus the intentional acts exclusion precluded coverage. The relevant facts from the summary judgment record are as follows.

¶ 5. In his deposition, Talley testified he would patronize or walk past the store almost daily for eight months prior to the July 24, 2009 incident. Scott, who had a "mouthful of gold" and was "not as tall" as 6'4½"

Talley, would always be "doing something at the store." Talley observed Scott working in the kitchen/deli section of the store preparing food and writing the cost on the food containers, which containers were then to be taken to Mustafa at the cash register. Talley also observed Scott performing other tasks, including providing security, shoveling snow, mopping floors, stocking, helping with inventory, and cleaning—"the man was doing any and everything that someone that works in a store would do." Most of the time, Scott would wear his "normal street clothes"; however, he would wear a white apron and "food gloves" "when he was in the meat department."

¶ 6. When Talley walked into the store on July 24 holding the door open for an acquaintance, Scott was walking from the kitchen area "cuss[ing] out" Talley for having the door open too long because the air conditioning was on. Scott "ran up on" and stood next to Talley "look[ing] at me, talking crazy, and I simply looked him up and down and said, 'poor thing.' " At the time, Mustafa was "behind the cage"; Talley did not hear Mustafa say anything. Talley "g[o]t some beer," and went to the cashier. Talley stated to his friend, "[T]hat's some bullshit." Scott then struck Talley in the face twice, causing him injuries.

¶ 7. Shakevia Winfory, Talley's daughter, provided deposition testimony that there was "a black guy" at the store with "gold teeth," who was around 5'11" and 250 pounds, who would prepare and serve nachos to customers, as well as put the price on the nachos so customers could take them to the counter to pay. The man was in the store almost every time she went there, and she also observed him stocking shelves, putting away groceries, "helping customers with their WIC," and "pack[ing] up their WIC prod-

ucts." Noting children sometimes stole from the store, Winfory testified the man "watch[ed] over the kids in the store" and occasionally told children they could not enter. She believed the man was an employee not a customer.

¶ 8. Geraldine Moore testified that for several months she would go into the store about twice a week, where she observed a "black guy" called "Goldy," who was medium height, "stocky," and had "gold in his mouth." She observed the man "stocking up" boxes, mopping the floor, and preparing nachos in the kitchen area. She heard "the owner" "maybe once or twice call him over to the counter."

¶ 9. Tammy Burks testified to observing a "stout" "black guy" in the store with "gold teeth" mopping, "putting beer up," "putting people out of the store," working behind the counter, and cooking on a restaurant-type grill. She also observed that "[w]hen the black guy was on the register, the Iranian guy was cooking." She had heard the man referred to as both "Keith" and "Goldy." She never believed the man to be a customer.

¶ 10. Sergeant Thomas Hines, of the Milwaukee Police Department, also provided deposition testimony. He testified he wrote a report regarding his investigation of the incident at the store, the report reflected his questioning of Mustafa, and, as he sat at his deposition, he had personal recollection of his conversation with Mustafa, which recollection comported with what he wrote in his report. Hines then read portions of the report, including that Mustafa told Hines he only knew Scott as "Keith," but that Scott "often comes in to the store to help [Mustafa] out . . . with stocking and security." Mustafa told Hines he noticed Talley and Scott "exchange[] words" on July 24 but did not see Scott hit

anyone. Hines left his phone number with Mustafa so Mustafa could have Scott call him. The next day a man representing he was Scott called and told Hines, among other things, that he did not "work" in the store "but helps out."

¶ 11. Hines also read portions of his report related to his review of video surveillance footage from July 24, stating he did have personal recollection, as he sat at the deposition, of the video footage he had directly observed. The footage showed Talley enter the store, engage in an argument with Scott, walk to the area with malt beverages, and then walk towards the front counter. It appeared Talley and Scott "inadvertently bumped into one another," after which Scott punched Talley in the face. Talley ran to the exit door, and Scott walked over to him and punched him in the face a second time. Hines did not observe any items on Scott that a security guard might have. Hines further testified he was aware of no evidence Mustafa actually paid Scott, but that based on his experience, many stores in that district "employ individuals and pay them cash for helping out."

¶ 12. At his deposition, Scott testified he was 6'2" tall and 260 pounds and lived in Kentucky in 2009, but did not recall the month or year he moved down there. He stated he became familiar with Mustafa prior to moving to Kentucky because he would occasionally go into the store to buy items for a nearby diner where he worked. He testified he did not work for Mustafa in the store, knows Talley but has never punched him, was not in an altercation with him on July 24, 2009, and did not talk with police in July 2009.

¶ 13. After this testimony, Talley's counsel read to Scott the portions of Hines' police report described above that relate to Hines' questioning of Mustafa and

review of surveillance video. Also from that report, counsel read that Scott informed Hines in a phone call that he does not work at the store but

> helps out Mustafa from time to time because a lot of people come into the store and try to steal and cause other problems.
>
> [Scott] stated that on the day of this incident the victim came into the store talking crazy and loud as usual. Scott stated that he told him to stop or he would have to leave. Scott stated that a few minutes later the victim bumped into him, causing him to feel threatened. He felt as though the victim was picking a fight with him, so he reacted to it and punched him in the face.
>
> He . . . stated further that when he walked over to the exit door to lock it, the victim was standing in the doorway with the door open, making threats to come back and shoot up the store. Scott stated that he then punched the victim a second time in the face and closed the door.

Scott again testified he did not help Mustafa in the store and also stated he did not know "anything about this incident."

¶ 14. In his interrogatory responses, Mustafa states Scott was "never employed" by him or Adams Foods, LLC. At his deposition, Mustafa testified Scott would come into the store "maybe every other day, maybe every day" but he was just a customer. Mustafa denied Scott ever worked in the kitchen, stocked shelves, provided security, or did "any kind of work for [him] whatsoever," and further testified only he and his father worked at the store in 2009, no one else "helped [him] out," and he did not tell police that anyone did. He stated he did not pay anyone in cash; there was no kitchen/cooking equipment in the store in

2009, "[j]ust a warmer, . . . microwave"; and in 2009 he did sometimes have a problem with customers stealing, but he did not hire security personnel. Mustafa first learned Scott's name from the police report and described him as "kind of light-skinned," "maybe six feet" or under, and about 180 pounds.

¶ 15. According to Mustafa, he was working at the cash register when Talley entered the store on July 24, 2009. Scott entered behind Talley, and they were arguing as they entered, but Mustafa "didn't think he was going to hit him." Mustafa stated Talley was "cussing" at Scott and making threats, and Scott was responding in kind. Mustafa told Scott "don't worry about him, he just talking. Just go get your stuff." Scott "came to the counter, bought his stuff." Mustafa did not hear anything being spoken by either of the men at this point and did not even know Scott struck Talley until the police later told him.

¶ 16. In July 2012, Talley filed suit, and Auto Owners retained counsel to defend Mustafa under a reservation of rights. Following substantial discovery, Auto Owners moved to bifurcate the issue of insurance coverage from the underlying liability action and stay proceedings on the underlying action. The circuit court granted the motion. Auto Owners subsequently moved for summary and declaratory judgment, which the court granted, dismissing Auto Owners from the case. Talley appeals.

*Discussion*

██

¶ 17. Talley asks us to determine whether the circuit court properly granted Auto Owners' motion for summary and declaratory judgment. Our supreme court has stated:

Whether summary judgment is properly granted is a question of law. Summary judgment is appropriate when the record demonstrates that no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law.

The grant or denial of a declaratory judgment is addressed to the circuit court's discretion. However, when the exercise of such discretion turns upon a question of law, we review the question independently of the circuit court's determination.

*Olson v. Farrar*, 2012 WI 3, ¶¶ 23, 24, 338 Wis. 2d 215, 809 N.W.2d 1 (citations omitted). Where, as in the case before us, "the circuit court's grant of declaratory judgment turn[s] upon its interpretation of an insurance policy," a question of law is presented, which we review de novo. *See id.*, ¶ 24.

¶ 18. In determining whether coverage exists under an insurance policy, we first examine the facts of the claim "to decide whether the policy makes an initial grant of coverage." *Wisconsin Pharmacal Co. v. Nebraska Cultures of Cal., Inc.*, 2016 WI 14, ¶ 22, 367 Wis. 2d 221, 876 N.W.2d 72 (citation omitted). "If the policy terms clearly do not cover the claim, generally, our analysis ends. However, 'if the claim . . . triggers a potential grant of coverage, we secondly examine whether any of the policy's exclusions preclude coverage for that claim.'" *Id.* (citation omitted). Lastly, "if an exclusion precludes coverage, we analyze exceptions to the exclusion to determine whether any exception reinstates coverage." *Id.* (citation omitted). Language in an insurance policy is to be construed as it "would be understood by a reasonable person in the position of the

insured." *Estate of Sustache v. American Family Mut. Ins. Co.*, 2008 WI 87, ¶ 19, 311 Wis. 2d 548, 751 N.W.2d 845 (citation omitted).

¶ 19. As relevant to this appeal, the Auto Owners' policy provides coverage for bodily injuries "caused by an 'occurrence,' " which is defined as an "accident," but "accident" is not defined. Coverage is excluded for such injuries that are "expected or intended from the standpoint of the insured."

¶ 20. As Auto Owners points out, because it made an initial determination to retain counsel to defend Mustafa, in reviewing the circuit court's grant of summary and declaratory judgment, we may do as the circuit court did and consider not only the language of the policy and the four corners of the complaint but also evidence in the record. *See Olson*, 338 Wis. 2d 215, ¶ 3. At this stage of the proceedings, Auto Owners' "duty to continue to defend is contingent upon the court's determination that [Mustafa] has coverage" if Talley proves his case. *See Sustache*, 311 Wis. 2d 548, ¶ 29.

¶ 21. Auto Owners argues, and the circuit court determined, that Scott's allegedly intentional act of punching Talley twice was determinative of whether Mustafa's insurance policy provides coverage. Its reasoning is that Scott's alleged injury-causing conduct was intentional, not an "accident," and thus was not an "occurrence" covered under the policy. Alternatively, Auto Owners asks us to affirm the circuit court because Mustafa had no reasonable expectation the policy would cover a claim stemming from an assault "by someone with no association" with Mustafa's business. We see things differently from Auto Owners.

## Occurrence/Intentional Acts Exclusion

¶ 22. On the question of whether Talley's injuries were caused by an "occurrence," Auto Owners and the circuit court incorrectly focus on Scott's conduct. While Talley alleged that Scott punched him, he also alleged Mustafa, *the insured,* had a duty to properly train and supervise Scott and that Mustafa's negligence was a substantial factor in causing his injuries.

¶ 23. Auto Owners relies heavily upon *Schinner v. Gundrum,* 2013 WI 71, 349 Wis. 2d 529, 833 N.W.2d 685, but we find *Schinner* more helpful to Talley than to Auto Owners. The insured in *Schinner* hosted an underage drinking party during which one of the individuals at the party assaulted another partygoer, the plaintiff. *Id.,* ¶ 2. On appeal, the *Schinner* court concluded there was "no question" the assaulter intended to assault the plaintiff; however, the court did not focus the coverage inquiry on the conduct of the assaulter—who most directly caused the plaintiff's injuries—but instead focused on the conduct of *the insured* who hosted the party and was being sued by the plaintiff. *Id.,* ¶¶ 2, 8, 66–68.

¶ 24. As in the case now before us, the insurance policy in *Schinner* provided coverage for an "occurrence," which was defined as an "accident," but the latter term was not defined. *Id.,* ¶¶ 13, 39. The court ultimately held there was no coverage for the insured, but held so because the allegations in the complaint and evidence in the summary judgment record made it clear the insured "took a number of intentional actions that ultimately caused [the plaintiff's] bodily injury." *Id.,* ¶¶ 68, 92. Thus, the court concluded the insured's

conduct contributing to the harm "was not accidental, so no occurrence triggered coverage under the homeowner's policy." *Id.*, ¶ 74.

¶ 25. *Schinner* guides us in two key ways. First, it makes clear we are to focus our coverage inquiry on the allegations against and conduct of the insured, here Mustafa, not the alleged assaulter Scott. Second, as significantly contrasted with *Schinner*, in this case neither the complaint nor evidence suggests, and no one has hinted, that *Mustafa*—the insured—committed any intentional wrongdoing. Rather, Talley is suing Mustafa on the ground he negligently trained and supervised Scott and such negligence was a cause of Talley's injuries.

■■

¶ 26. We find *Miller v. Wal-Mart Stores, Inc.*, 219 Wis. 2d 250, 580 N.W.2d 233 (1998), and *Doyle v. Engelke*, 219 Wis. 2d 277, 580 N.W.2d 245 (1998), particularly applicable to this case. In *Miller*, Wal-Mart employees detained Miller, a customer, on suspicion of shoplifting. *Miller*, 219 Wis. 2d at 257. Miller sued Wal-Mart, claiming its employees, "unlawfully stopped, detained, interrogated, and searched him." *Id.* A jury found Wal-Mart negligent in hiring, training or supervising its employees, causing Miller damage. *Id.* On appeal, our supreme court held that "[i]f Wal-Mart fails to properly hire, train or supervise its employees, it breaches its duty to shoppers at its store." *Id.* at 261. Considering causation, the court noted, "[T]here can be more than one substantial factor contributing to the same result and thus more than one cause-in-fact." *Id.* at 261–62 (quoting *Morgan v. Pennsylvania Gen. Ins. Co.*, 87 Wis. 2d 723, 735, 275 N.W.2d 660 (1979)). "If reasonable people could differ on whether the defendant's negligence was a cause-in-fact of the plaintiff's

injuries, the question is one for the jury." *Id.* at 262. "With respect to a cause of action for negligent hiring, training or supervision," the *Miller* court continued, "we determine that the causal question is whether the failure of the employer to exercise due care was a cause-in-fact of the wrongful act of the employee that in turn caused the plaintiff's injury." *Id.*

> This requires two [jury] questions with respect to causation. The first is whether the wrongful act of the employee[, whether intentional or unintentional,] was a cause-in-fact of the plaintiff's injury. The second question is whether the negligence of the employer was a cause-in-fact of the wrongful act of the employee[].

*Id.*

¶ 27. Considering *Miller*, in the case now before us, if a jury finds Scott was an employee of Mustafa or otherwise had a special relationship with him that created an obligation for Mustafa to train and/or supervise Scott with due care,[3] the jury first will need

---

[3] *See* RESTATEMENT (SECOND) OF TORTS § 315(a) (1965) ("There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless . . . (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct."); *see also* RESTATEMENT (SECOND) OF TORTS §§ 316–19 (identifying special relations which give rise to duty of actor to control a third person's conduct); *see also Gritzner v. Michael R.*, 228 Wis. 2d 541, 554, 598 N.W.2d 282 (Ct. App. 1999) (addressing RESTATEMENT (SECOND) OF TORTS § 315—stating that a failure to supervise claim may be maintained in a context other than employer-employee and holding that "a legal relationship is not necessary to constitute a special relationship"), *aff'd in part*, 2000 WI 68, 235 Wis. 2d 781, 611 N.W.2d 906; *cf. Korenak v. Curative Workshop Adult Rehab. Ctr.*, 71 Wis. 2d 77, 81, 237 N.W.2d 43 (1976).

to determine if Talley's injuries were caused by wrongful conduct of Scott. If the jury so finds, then it will need to determine if Mustafa was negligent in training or supervising Scott and, if so, whether such negligence was a substantial factor in producing, i.e., was a cause of, Scott's injury-causing conduct. *See id.* at 261–62 (explaining the test for cause-in-fact as being whether the negligence was a "substantial factor" in producing the result).

¶ 28 *Doyle* is particularly instructive, as it directly addresses the question of whether an insurance policy potentially covers an allegation of negligent supervision. In *Doyle*, two employees of a radio station, WVCY, "filed a false security agreement with the Secretary of State, thereby encumbering the assets of Doyle . . . [and] served a false subpoena at Doyle's residence." *Doyle*, 219 Wis. 2d at 282. Doyle sued the

---

In this case, the complaint alleges the assaulter was an "agent[], employee[], or representative[]" of Mustafa. In his brief-in-chief on appeal, Talley argues that

> it does not matter if Scott's act was intentional . . ., as long as there is an injury to a third party by the employee *or other party under the supervision of the supervising party,* the injured party, Talley, can bring a claim of negligent supervision, hiring, training against the employer *or party that supervised the individual* that caused harm to the injured party, Talley. As long as there is a nexus between the negligent supervision party and the party that was negligently supervised which caused injury to a third party due to the negligent supervision, the injured party may bring a claim of negligent supervision against the supervising party, in this case, Mustafa and his insurance company. (Emphasis added.)

Talley also comments that Auto Owners' defense "of Scott not being an employee . . . [is] without merit," adding that "Scott does not have to be an employee." In its response brief, Auto Owners provides no response to Talley's assertion that Scott does not have to actually be an "employee" of Mustafa in order for Talley's negligent training and supervision claim to stand.

employees and WVCY, alleging multiple causes of action including negligent supervision. *Id.* at 283. On appeal, the *Doyle* court considered whether WVCY's insurer was required to defend WVCY due to Doyle's claim it negligently supervised the employees. *Id.* at 286. The court stated that "[w]hile negligent supervision does require an underlying wrong to be committed by the employee as an element, the tort actually focuses on the tortious, i.e. negligent, conduct of the employer," *id.* at 291 n.6, and noted that Doyle's complaint alleged WVCY negligently supervised the employees and such negligence caused Doyle injury, *id.* at 287. The insurance policy provided coverage for an "event" and defined "event" as "an accident," *id.* at 289, just as the term "occurrence" is defined in the policy between Mustafa and Auto Owners.

¶ 29. As in the present case, the insurance policy in *Doyle* did not define the term "accident," but considering dictionary definitions of "accident" as well as "negligence," the court recognized that "comprehensive general liability policies are 'designed to protect an insured against liability for negligent acts resulting in damage to third-parties.' " *Id.* at 289–90 (citations omitted). "Accordingly," the *Doyle* court had "little trouble concluding that a reasonable insured would expect the Policy provision defining 'event' to include negligent acts," including negligent supervision. *Id.*; *see also Sustache*, 311 Wis. 2d 548, ¶ 53 n.13 (citing LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE § 127:21, at 127–54–127–55 (3d ed. 2002) ("If the insured is also the assailant, the result is that there is no coverage for the assault . . . . However, where the insured is not the assailant but is instead liable based upon vicarious liability, negligent supervision, or some

other negligence theory, the assault may constitute an accident or occurrence, at least from the standpoint of the insured.")).

¶ 30. Similarly, in the case now before us, we "have little trouble concluding that a reasonable insured would expect the Policy provision defining ['occurrence'] to include negligent acts," including negligent training and supervision. A reasonable business owner in Mustafa's position would expect that if a customer sued Mustafa or his business alleging he caused injury to the customer because of his negligence, including negligence in training or supervising an "agent[], employee[], or representative[]," that the insurance policy would provide coverage for that claim.[4]

¶ 31. The *Doyle* court also addressed a policy exclusion similar to the one in this case related to " '[b]odily injury' . . . 'expected and intended' from the standpoint of the insured." The exclusion in *Doyle* indicated the insurer would not cover injuries that were "expected or intended by the protected person." *Doyle*, 219 Wis. 2d at 290. Both WVCY and its employees were protected persons under the policy. *Id.* The *Doyle* court found it "significant" that the particular coverage issue before it was over coverage of the insured *employer*, WVCY, not over the insurer's "obli-

---

[4] Auto Owners cites to *Wisconsin Pharmacal Co. v. Nebraska Cultures of Cal., Inc.*, 2016 WI 14, 367 Wis. 2d 221, 876 N.W.2d 72. We find this case unhelpful, in that, unlike *Doyle v. Engelke*, 219 Wis. 2d 277, 580 N.W.2d 245 (1998), *Wisconsin Pharmacal* does not deal at all with the question of coverage in a negligent supervision (or training) context. Moreover, the key points from *Wisconsin Pharmacal* upon which Auto Owners relies, relate to our supreme court's interpretation of California, not Wisconsin, insurance law. *See Wisconsin Pharmacal*, 367 Wis. 2d 221, ¶¶ 69–73.

gation to defend WVCY's employees individually for their intentional acts against Doyle." *Id.* The court pointed out that the policy excluded coverage for bodily injury that was "intended by the protected person," but noted that Doyle's negligent supervision claim alleged "no acts causing bodily harm which were intended by WVCY." *Id.* at 291. Instead, the claim "focuse[d] on WVCY's negligence in supervising its employees—whether or not the employees committed the underlying wrong intentionally." *Id.*; *see also L.L.N. v. Clauder*, 209 Wis. 2d 674, 698–99 n.21, 563 N.W.2d 434 (explaining that "[i]n contrast [to a vicarious liability claim], with a negligent supervision claim, an employer is alleged to be liable for a negligent act or omission it has committed in supervising its employee. Therefore, liability does not result solely because of the relationship of the employer and employee, but instead because of the independent negligence of the employer." (citing RESTATEMENT (SECOND) OF AGENCY § 213 cmt. d. (1958)). The *Doyle* court concluded the insurer owed WVCY a duty to defend it based on Doyle's negligent supervision claim. *Doyle*, 219 Wis. 2d at 292.

¶ 32. In the present case, the coverage dispute is not over an obligation of Auto Owners to defend *Scott* for his alleged intentional act of striking Talley, but over whether the policy provides the insured, Mustafa, with coverage for his allegedly negligent training and/or supervising of Scott. Similar to the claim before the *Doyle* court, Talley's claim against Mustafa does not allege Mustafa caused Talley harm through intentional acts but "focuses on" Mustafa's negligence in training and supervising Scott.[5] Following *Doyle*, we conclude Auto Owners owes Mustafa a duty of defense

[5] Auto Owners does not suggest Talley's complaint alleges injury-causing acts that were intended by Mustafa.

based on Talley's negligent training and supervision claim—"whether or not [Scott] committed the underlying wrong intentionally." *Id.* at 291; *see also John Doe I v. Archdiocese of Milwaukee*, 2007 WI 95, ¶ 33, 303 Wis. 2d 34, 734 N.W.2d 827 (noting that in *Doyle* "[w]e . . . said that while the intentional acts exclusion in the policy may exempt the insurer from defending the individual employees for what was characterized as intentional conduct, the tort of negligent supervision focused on the negligence of the employer" (citation omitted)).

**Employee/Special Relationship**

■

¶ 33. Auto Owners alternatively contends it has no duty to defend or indemnify Mustafa because Scott had "no association with [Mustafa's] business" and Mustafa had "no obligation to supervise" him, and thus "Mustafa had no reasonable expectation" Talley's claim that Mustafa failed to properly train and supervise Scott would be covered under the policy.[6] It is Auto Owners' position that because courts must look at the

---

[6] Without developing an argument, Auto Owners also has intimated Talley lacks standing to assert his position that the policy provides Mustafa with coverage for the negligent supervision claim. Talley, on the other hand, explained to the circuit court that he was arguing the policy covered Mustafa because he wanted to ensure there is money from which he can collect if he succeeds at trial. For the reason he states, Talley unquestionably has an interest in how the coverage issue is resolved. *See Doyle*, 219 Wis. 2d at 285–86 (holding that one insurer of defendant WVCY (Employers Insurance of Wausau) had standing to assert that WVCY had coverage under the policy of another insurer (St. Paul Fire & Marine Insurance Company), even though no contractual relationship existed between the two insurers, because "the circuit court's resolu-

coverage issue from the standpoint of the insured, there necessarily is no coverage here because Mustafa, the insured, has stated Scott was not an employee and with this agrees with Auto Owners that the policy does not provide coverage for the claims against Mustafa. We are unpersuaded.

¶ 34. To begin, a jury question exists on the issue of whether Scott was an employee of Mustafa or otherwise had a special relationship with him such that Mustafa had an obligation to train and supervise Scott with due care. Between his interrogatory responses and deposition testimony, Mustafa has provided evidence that Scott was not an employee of the store and did not do "any kind of work for [Mustafa] whatsoever," he did not pay Scott in cash, and Scott was just another customer. Consistent with this, Scott testified at his deposition that he did not help Mustafa in the store.

¶ 35. However, at his deposition, Talley testified he went to or past the store almost daily for many

tion of St. Paul's coverage of WVCY directly affects Employers' participation in the suit under the terms of its policy," and thus, Employers had an interest in the outcome of the coverage dispute). Moreover, although not addressed by either party on appeal, it appears Talley may have been able to bring a direct action against Auto Owners without even naming Mustafa as a defendant. *See* Wis. Stat. § 632.24 (2015–16); *see also Estate of Otto v. Physicians Ins. Co. of Wis., Inc.*, 2008 WI 78, ¶ 32, 311 Wis. 2d 84, 751 N.W.2d 805 (recognizing that "[u]nder the direct action statute, the complaining party may allege the insured's conduct, and the insurer's liability therefor, directly against the insurer. The statute renders the insurer 'directly liable' for the conduct of its insured. '[J]udgment may be directly against the insurer and . . . payment must be made directly to the injured party.' In addition, the insured is not a necessary party to the action brought against its insurer." (citations omitted).

777

months before the July 24 incident and Scott would "always be there" "doing something at the store." He observed Scott providing security, shoveling snow, mopping floors, stocking, cleaning, helping with inventory, preparing food, and writing the cost on the food containers, which containers were then to be taken to Mustafa at the cash register. Talley further testified that when Scott was working in the meat department, he would sometimes wear "a white apron" and "food gloves." According to Talley, when Talley entered the store on the day of the incident, Scott "cussed out" Talley for having the door open too long because the air conditioning was on. If a jury finds Talley credible, based on his testimony alone, it could reasonably conclude Scott was an employee of or had a special relationship with Mustafa.

¶ 36. Talley's testimony, however, does not stand alone. Winfory, Moore, and Burks provided additional evidence from which a jury could reasonably infer Scott was much more than just a customer. *See supra* ¶¶ 7–9. In addition, Hines testified Mustafa told him Scott "often comes in to the store to help him out . . . with stocking and security"; Hines "left [his] phone number with Mustafa so that he could have [Scott] call [him]" and a man representing he was Scott did in fact call Hines the following day; and the man who called Hines told Hines he did not "work" in the store "but helps out." Hines also testified that while he was aware of no evidence Mustafa actually paid Scott, based upon his experience, many stores in that district "employ individuals and pay them cash for helping out." Even without direct evidence of payment by Mustafa to Scott, a jury could reasonably infer Scott

worked for or had a special relationship with Mustafa which obligated Mustafa to train and supervise Scott with due care.

¶ 37. Significantly, Mustafa's personal beliefs as to whether the policy provided coverage for Talley's claims are not determinative. The language of an insurance policy is to be construed as it "would be understood by a reasonable person in the position of the insured," *Sustache*, 311 Wis. 2d 548, ¶ 19 (citation omitted); thus, Mustafa's subjective beliefs do not control. Rather, the question is whether a reasonable person in the position of Mustafa would have expected at the time he/she entered into the contract that the policy provided coverage for circumstances such as those in this case. We conclude a reasonable person in the position of Mustafa would have expected that if a customer sued him/her on the basis that his/her alleged negligence—including negligence in training and/or supervising an employee or person with a special relationship—causally contributed to the customer's injuries, the insurer would provide a defense and ultimately indemnify him/her if the allegations are proven.

¶ 38. For the foregoing reasons, we reverse the order of the circuit court and remand for further proceedings consistent with this decision.

*By the Court.*—Order reversed and cause remanded.

¶ 39. REILLY, P.J. (*dissenting*). The issue before us is whether Auto Owners Insurance Company's policy provides coverage to Mustafa Mustafa. Left unsaid by the majority is that Mustafa (the insured) agreed with Auto Owners (the insurer) that no contractual obligation of coverage existed as there was no "occurrence"

under the policy. The complaint alleged that "John Doe" "*attacked*" the plaintiff and that a videotape "showed the *assault*." No extrinsic evidence showed anything to the contrary. An intentional "assault/attack" is not an "occurrence" as an "assault/attack" is not "accidental," and Doe's status as an employee, agent, or customer of Mustafa is not relevant to a court's initial determination of whether there was an "occurrence" under the policy. *See Schinner v. Gundrum*, 2013 WI 71, ¶ 8, 349 Wis. 2d 529, 833 N.W.2d 685; *Estate of Sustache v. American Family Mut. Ins. Co.*, 2008 WI 87, ¶¶ 54, 56, 311 Wis. 2d 548, 751 N.W.2d 845; *American Family Mut. Ins. Co. v. American Girl, Inc.*, 2004 WI 2, ¶ 37, 268 Wis. 2d 16, 673 N.W.2d 65.

¶ 40. I agree with the circuit court's grant of declaratory judgment that Auto Owners had no duty to defend nor indemnify Mustafa for the damages alleged in the complaint. The circuit court examined the facts as alleged in the complaint as well as the extrinsic facts provided in discovery. Doe's "assault/attack" was an intentional act. As I agree with the circuit court that intentional acts are not accidents, I respectfully dissent.